849 So.2d 734 (2003)
Sherry WATTERS, Frances M. Breyne, Gina Recasner, Gretchen Wiltz, and Wendy Lemieux individually and on behalf of others similarly situated
v.
DEPARTMENT OF SOCIAL SERVICES, Department of Health and Hospitals, Division of Administration, BG Real Estate Services, Inc., Baha Towers Limited Partnership, Bahar Development, Inc., Noob I GP, LLC, Noob I, LP and ABC Insurance Company.
No. 2002-CA-1425.
Court of Appeal of Louisiana, Fourth Circuit.
June 4, 2003.
*735 Mickey P. Landry, Frank J. Swarr, Landry & Swarr, L.L.C., Craig Mitchell, Mitchell Ahern, New Orleans, LA, Robert G. Creely, Nicole, Loup, Hackett, Madro, Bandaries, Amato & Creely, APLC, Gretna, LA, for Plaintiff/Appellee.
Lawrence J. Duplass, Joseph B. Morton, III, Christian B. Bogart, Kevin R. Derham, James A. Stapp, Duplass, Zwain, Bourgeois & Morton, Metairie, LA, for Defendant/Appellant.
(Court composed of Judge TERRI F. LOVE, Judge DAVID S. GORBATY, and Judge LEON A. CANNIZZARO, JR.).
Judge LEON A. CANNIZZARO, JR.
The defendant, BG Real Estate Services, Inc. ("BG"), appeals from a trial court judgment granting the plaintiffs' rule for contempt and sanctions. We affirm.

FACTUAL AND PROCEDURAL HISTORY
The plaintiffs in this litigation are employees of several agencies of the State of Louisiana[1] whose offices are located in the Plaza Tower Building at 1001 Howard Avenue, New Orleans, Louisiana. On October 25, 2001, the plaintiffs filed a class action suit against BG, the leasing and management agency of the Plaza Tower Building, and other defendants, alleging that they sustained personal injuries from exposure to mold and other toxic substances inside the building. On October 30, 2001, the plaintiffs filed a Motion and Order to Permit Entry Onto Premises For Minor Destructive Testing and Request for Injunctive Relief. Pursuant thereto, the trial court issued a temporary restraining order prohibiting any environmental cleaning of the building pending the plaintiffs' being allowed to conduct environmental tests of the premises. Also, on that day, the parties entered into a consent judgment, which the trial court signed and rendered on November 5, 2001. The consent judgment provided:
*736 IT IS ORDERED, ADJUDGED AND DECREED that BG Real Estate Services, Inc. shall not do or authorize any clean up of toxic substances located at 1001 Howard Avenue, New Orleans, Louisiana, until putative class representatives and defendant, BG Real Estate Services, Inc., can conduct joint environmental testing of the areas occupied by the Department of Social Services, Department of Health and Hospitals and Division of Administration;
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the areas to be tested include areas occupied by putative class members who work for the Department of Social Services, Department of Health and Hospitals and Division of Administration;
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the areas to be tested include the office space occupied by the above putative class members as well as the HVAC[2] system that services the premises that the putative class members occupy;
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the environmental testing shall be completed no later than November 9, 2002(sic); and
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that until the environmental testing can be completed that the putative class members or any of their representatives or agents shall not move any of the ceiling tiles located in the area in which they occupy.
(Footnote added).
On November 8, 2001, the plaintiffs' counsel argued to the trial court that Donna Davis, BG's Senior Operations Manager, had delayed the testing and restricted his clients' right to inspect, sample, and test the premises. At that time, the trial court ordered the testing to commence immediately. EnviroCare, Inc., the plaintiffs' environmental consulting firm, completed the testing on November 15, 2001, well past the November 9, 2001 deadline. As a result, the plaintiffs filed a Rule for Contempt and Sanctions, alleging that Davis intentionally interfered with and delayed the testing by restricting EnviroCare's entry onto the premises and by seeking the Louisiana Department of Environmental Quality's ("DEQ") approval before allowing the court ordered testing to proceed. The plaintiffs further alleged that BG directly violated the consent judgment by removing ceiling tiles and cleaning the HVAC system while the environmental testing was in progress.
Following a two-day hearing on the plaintiffs' rule for contempt, the trial court rendered judgment holding BG in contempt and imposed sanctions of $7,000.00. In her reasons for judgment, the trial court stated:
This Court finds that BG Real Estate Services, Inc., through Donna Davis, intentionally interfered with and delayed the time of entry onto the premises, and the completion of the environmental testing. This Court finds more credible the plaintiffs' testimony that tiles were removed and the HVAC system subsequently cleaned. Additionally, this Court finds that BG Real Estate Services, Inc.[,] intentionally interfered with the environmental testing by creating an element of delay through a last-minute facsimile requiring the building manager, Michelle Thibodeaux, to impose a list of prerequisites, including DEQ notification, before allowing inspection of the premises.

*737 APPLICABLE LAW
Constructive contempt of court is any contempt other than a direct one, including the "[w]ilful disobedience of any lawful judgment, order, mandate, writ, or process of the court." La. C.C.P. art. 224. A trial court is vested with great discretion to determine whether circumstances warrant holding a party in constructive contempt of court pursuant to La. C.C.P. art. 224 for wilful disobedience to a court order. Alagdon v. Guertin, 97-0235, p. 5 (La.App. 4 Cir. 10/1/97), 701 So.2d 480, 483. Moreover, a trial court must find that the party's violation was wilful in order to hold that party in contempt, meaning that the party must have "`intentionally, knowingly and purposely acted or failed to act.'" Id., citing Riley v. Pennix, 442 So.2d 563, 565 (La.App. 1st Cir.1983). A court may not hold a party in contempt unless it finds that the party's reasons for violating the order were without justifiable excuse. Id.
In determining the appropriate penalty for disobedience of or disregard for court orders relating to pretrial procedures, a court is to consider whether the attorney and/or the client committed the misconduct, the stage of the proceeding at which the violation occurred, the presence or absence of prejudice to the opposing party's preparation of the case, and the nature and persistency of the misconduct that constitutes the violation. Benware v. Means, 99-1410 (La.1/19/2000), 752 So.2d 841, 847. Each case must be decided upon its own facts and circumstances, and the trial judge is vested with much discretion in determining the penalty for a violation of pre-trial or discovery orders. Id. A trial court's decision to impose sanctions for failure to comply with a pre-trial or discovery order, as well as its choice of sanctions, will not be reversed absent a clear showing of an abuse of discretion. See Johnson v. Nguyen, XXXX-XXXX (La. App. 4 Cir. 7/11/01), 793 So.2d 370; Reeder v. New York Life Insurance Company, 01-148 (La.App. 5 Cir. 6/27/01, 790 So.2d 712). Not only is the trial court's choice of sanction subject to the abuse of discretion standard of review, but as with any other case, the trial court's factual findings cannot be reversed by a reviewing court where there is a reasonable factual basis in the record for such a finding and where such a finding is not clearly wrong. Horton v. McCary, 93-2315 (La.4/11/94), 635 So.2d 199, 205 (J. Kimball dissents, citing Stobart v. State through Dept. of Transportation and Development, 617 So.2d 880 (La.1993)).

DISCUSSION
On appeal, BG raises four assignments of error. First, it argues that the trial court erred in finding that BG delayed the on site environmental testing of the property in wilful disobedience of the consent judgment. BG contends that the building's lease obligations and asbestos maintenance plan required that the DEQ be notified before any environmental testing which involved the disturbance of ceiling tiles and/or the inspection of areas above the ceilings could begin. Based on advice from BG's attorney, Davis, BG's Senior Operations Manager, insisted that the DEQ be notified before permitting the testing to proceed. BG also attributes the delay to EnviroCare's failure to provide either Davis or Michelle Thibodeaux, the building manager, its "protocol" or inspection plan prior to the morning the inspection was to commence. Its failure to submit a plan prevented BG from making prior arrangements with the building's tenants to allow EnviroCare's inspectors access to the restricted areas. Similarly, BG claims EnviroCare's lack of organization once on the premises contributed to the delay. For example, rather than splitting into several groups to simultaneously *738 test several areas, EnviroCare's inspectors remained together throughout the testing process.
Although BG claims that the delay was caused by EnviroCare's disorganization and failure to provide it with a protocol prior to the time testing was to commence, the evidence in the record indicates otherwise. It is undisputed that the testing and inspection of the premises was to begin at 10:00 a.m. on November 8, 2001. However, at 9:10 a.m., David Lakin, vice-president of BG, faxed a checklist to Thibodeaux containing twenty items that BG wanted satisfied before testing would proceed. Some of the items included city and state permits, the DEQ notification, proof of licensing from the environmental testing firms, proof of certifications from the individual inspectors, notarized authorizations from the buildings' occupants whose work areas were to be tested, and hold harmless agreements.
Steven Brien, EnviroCare's president and a forensic environmental investigator, testified that he and the other inspectors arrived at the Plaza Tower Building at 9:00 a.m. on November 8, 2001. Several days prior to commencement of the inspection, Brien had requested that Davis provide him with the plumbing, electrical, and HVAC system diagrams as well as blueprints for each floor of the building. He also requested that a BG maintenance representative, who was familiar with the building, accompany EnviroCare's inspectors during the testing. According to Brien, Davis' failure to satisfy his request and the unavailability of a BG maintenance representative greatly delayed the testing. Instead of taking an estimated two and one-half days to complete, the testing took five days. Brien also disputed Davis' claim that EnviroCare had not given BG its testing protocol, testifying that he sent an inspection plan to BG on October 31, 2001.
Gloria Bolds, an attorney with the Department of Justice, testified that she arrived at the Plaza Tower Building shortly before 9:00 a.m. on November 8, 2001, to witness on behalf of the State the court ordered environmental testing of the premises. According to Bolds, Davis suggested that she, as a representative of the State, contact the DEQ to notify it of the testing. Davis also told those persons present that they had to sign hold harmless agreements before the testing could commence. Bolds informed Davis that because the State was neither a party to the consent agreement nor conducting the testing, the State's representatives were not responsible for notifying DEQ and did not have to sign hold harmless agreements. Bolds testified that Davis delayed the testing and characterized her as "hostile" to those present. When asked whether the plaintiffs were responsible for the delay, Bolds responded, "no."
Bertha Meisner, an adjustor for the Louisiana Office of Risk Management, testified that she, too, was present for the environmental testing. She corroborated Bolds' testimony that Davis had informed all parties that the DEQ had to be notified before the testing could proceed and that any person participating in the testing had to sign a hold harmless agreement. Meisner testified that Davis had insisted that no specimen samples could be collected from the site without her authorization. Davis also restricted the inspectors' access to certain areas of the building. In particular, she would not allow EnviroCare's investigators to inspect the HVAC system within the agreed upon time frame because, allegedly, BG's maintenance personnel were unavailable to turn off the air conditioner, even though the maintenance personnel were in the building's lobby just moments before. Like Brien and Bolds, Meisner attributed the delay to Davis' actions.
*739 As to BG's claim that the DEQ approval was necessary before ceiling tiles could be removed for environmental testing purposes, thus, contributing to the delay, the testimony of Aaron Johnson, BG's maintenance engineer, indicates otherwise. Johnson testified that he routinely removed ceiling tiles without the DEQ's authorization.
In view of the evidence in the record, the trial court's finding that BG, through Davis, intentionally interfered with and delayed the time of entry on to the premises and the completion of testing is not clearly wrong.
BG, in its second and third assignments of error, argues that the trial court erred in determining that the removal of the ceiling tiles and the cleaning of the HVAC system constituted wilful disobedience of the consent judgment. BG does not dispute that the ceiling tiles were removed. Rather, it contends that the consent judgment only prohibited the plaintiffs and/or their agents from removing the tiles. BG claims that the plumbing contractors had removed the ceiling tiles during routine maintenance and placed them in nearby bins. Similarly, BG asserts that the consent judgment did not prohibit it from doing routine maintenance on the HVAC system.
The temporary restraining order issued on October 30, 2001 enjoined the environmental clean up of the state agencies' offices located in the Plaza Tower. The consent judgment rendered on November 5, 2001 prohibited BG from authorizing or conducting any clean up of toxic substances on the premises until the parties completed the court ordered environmental testing. Despite the restraining order and consent judgment, Annie Brown, an employee of the Department of Health and Hospitals, whose offices were located on the ninth and tenth floors of the building, testified that BG maintenance personnel had removed wet ceiling tiles on the tenth floor from November 6th or 7th through November 15th because the men's restroom on the eleventh floor had flooded. Sherry Watters, a plaintiff in the suit and an employee of the Department of Social Services, testified that BG personnel had removed wet ceiling tiles from the sixteenth floor of the building on November 9th and 13th while the environmental testing was in progress. Both Brown and Watters described the wet ceiling tiles as containing some type of residue. Brien, too, noted that BG maintenance personnel had removed and replaced several dirty, moldy ceiling tiles during the testing period.
Regarding the HVAC system, Brien testified that during the testing and inspection of the building he noted that several components of the "air handling system" appeared to have been cleaned and freshly painted. Specifically, he recalled seeing a "mold-type substance" that had been painted over. Brien explained that several HVAC system components were wrapped in fresh tape and when peeled away disclosed a "black powdery substance." He also noted that air conditioning drip pans in several areas of the building had been replaced while testing was underway.
Watters testified that although Davis had informed the plaintiffs that BG would not allow any environmental testing to be done on Saturday, November 10th, because it did not want to pay its maintenance personnel overtime, she (Watters) drove by that morning and saw a crane and two flatbed trucks with air conditioning equipment in front of the building. The street had been blocked off and BG maintenance personnel were working on the premises outside the building.
Even though the consent judgment expressly prohibited the plaintiffs and/or their agents from removing the ceiling *740 tiles, it unequivocally prohibited BG from authorizing or conducting any toxic substance cleaning until the court ordered environmental testing was complete. The unrefuted testimony that BG maintenance personnel removed moldy ceiling tiles from restricted areas during the testing period supports that trial court's finding that BG wilfully violated the consent judgment. Similarly, Brien's testimony that several HVAC system components were wrapped in fresh tape, which concealed a black powdery substance, and that air conditioning drip pans had been replaced was unrefuted. Based on this testimony the trial court concluded that BG maintenance personnel had cleaned the HVAC system. The trial court found the plaintiffs' witnesses to be credible. Thus, considering their testimony, the trial court's finding that BG had removed ceiling tiles and cleaned the HVAC system in violation of the consent judgment was not clearly wrong.
Finally, in its fourth assignment of error, BG argues that the trial court abused her discretion by ordering it to pay the plaintiffs' $7000.00 in sanctions for its wilful disobedience of the consent judgment. The trial court determined that BG's failure to comply with the terms of October 30, 2001 consent judgment prejudiced the plaintiffs. Because the evidence in the record clearly supports that finding, the trial court did not abuse her discretion in imposing sanctions against BG in the amount of $7,000.00.

CONCLUSION
Accordingly, for the reasons stated herein, the judgment of the trial court is affirmed.
AFFIRMED
NOTES
[1] The Louisiana Department of Health and Hospitals, Department of Social Services, and the Office of the Governor Division of Administration
[2] heating, ventilation, and air conditioning