15 So.3d 1128 (2009)
Sherry WATTERS, Frances M. Breyne, Gina Recasner, Gretchen Wiltz and Wendy Lemieux, Individually, and et al.
v.
DEPARTMENT OF SOCIAL SERVICES, et al.
No. 2008-CA-0977.
Court of Appeal of Louisiana, Fourth Circuit.
June 17, 2009.
*1133 Mickey P. Landry, Frank J. Swarr, David R. Cannella, Landry & Swarr, L.L.C., New Orleans, Robert G. Creely, The Creely Law Firm, L.L.C., Salida, CO, Thomas P. Owen, Jr., Stanley, Reuter, Ross, Thornton & Alford, L.L.C., New Orleans, LA, for Plaintiffs/Appellees.
James D. "Buddy" Caldwell, Attorney General, James J. Bolner, Jr., Special Assistant Attorney General, Chopin Wagar Richard & Kutcher, LLP, Metairie, LA, Matthew P. Chenevert, Special Assistant Attorney General, Michael J. Marsiglia, Special Assistant Attorney General, Berrigan, Litchfield, Schonekas, Mann, Traina and Bolner, LLC, New Orleans, LA, for Defendants/Appellants.
(Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge PATRICIA RIVET MURRAY, Judge MICHAEL E. KIRBY, Judge TERRI F. LOVE, Judge PAUL A. BONIN).
*1134 PATRICIA RIVET MURRAY, Judge.
This is a mold-related personal injury class action. The plaintiffs are employees of the State of Louisiana who worked in the Plaza Tower office building from 1996 until 2002. The plaintiffs allege that they were exposed to toxic mold substances while working in the Plaza Tower building. Although the plaintiffs named multiple parties associated with the building as defendants, the only defendants at the time of trial were three state agencies: the Department of Health and Hospitals ("DHH"), the Department of Social Services ("DSS"), and the Division of Administration ("DOA")(collectively the "State").
This court in Watters v. Department of Social Services, 05-0324 (La.App. 4 Cir. 4/19/06), 929 So.2d 267, writs denied, 06-1598, 06-1601 (La.9/29/06), 937 So.2d 870 (Watters I), affirmed the trial court's decision certifying the class, but remanded for the trial court to clarify the definition of the class. On remand, the trial court redefined the class and conducted a seven-day bench trial on two issues: (i) the State's liability to the class;[1] and (ii) the damages sustained by each of the five named class representatives  Sherry Watters, Frances M. Breyne, Gina Recasner, Gretchen Wiltz, and Wendy Lemieux (the "Class Representatives"). From the trial court's judgment finding the State liable and awarding damages to each of the Class Representatives, the State appeals. For the reasons that follow, we affirm the trial court's finding of liability and its award of damages to the Class Representatives, but amend the judgment in two respects: (i) to reduce the fault allocated to the State from 100% to 35%; and (ii) to reduce the award for court costs to an amount supported by the record.

I.
On October 25, 2001, the Class Representatives filed this suit on behalf of all State employees who were assigned to work in the Plaza Tower office building, located at 1001 Howard Avenue in New Orleans, from September 1996 to February 2002. They named as defendants various entities associated with the building including the State; the building management company, BG Real Estate Service, Inc. ("BG"); and the building owner, BAHA Towers Limited Partnership ("BAHA").[2] They averred that they had complained of, among other things, water leaks, defective elevators, the presence of unknown toxic substances, and safety hazards. They further averred that during their occupancy of the building they suffered excessive illnesses, including sinus and allergy problems, debilitating headaches, skin irritation, watery eyes, and fatigue. They alleged that they were made aware of a September 2001 report indicating that the Plaza Tower contained toxic mold and that they had seen news paper and television reports regarding the danger of such toxic substances. They alleged two theories of liability: (i) the State's breach of its duty to provide them with a safe and healthy work environment, La. R.S. 23:13; and (ii) the building owner's breach of its duty to repair the building over which it had care, custody, and control, La. C.C. art. 2322. Both theories of *1135 liability were based on the allegation that the Plaza Tower was a mold-infested building.
The State, through various agencies, leased office space in the Plaza Tower from BAHA to house employees of DHH and DSS by entering into three separate leases: (1) the DSS's 1995 lease for floors sixteen and seventeen; (2) the DHH's 1996 lease for floors one (the Annex), nine, ten, and eleven; and (3) the DSS's 1998 lease for floors twelve, fourteen, fifteen, twenty-six, twenty-seven, and twenty-eight. As required by the procurement code, the DOA approved all three leases.[3] In 1996, DHH and DSS employees moved into the building. In 1998, the DSS entered into its second lease and moved additional DSS employees into the building. In total, approximately six hundred State employees worked in the Plaza Tower.
All three leases were for five-year terms. In September 2001, both the DSS's 1995 lease and the DHH's 1996 lease expired. Neither the DSS nor the DHH chose to exercise the option to renew its lease for another five-year term because of the history of problems with the leased premises. Instead, at the end of the respective five year terms, the DDS's 1995 lease and the DHH's 1996 lease were continued on a month-to-month basis. During this period, the building owner threatened to double the rent. In October 2001, the Class Representatives filed this suit. In November 2001, the DSS's 1998 lease, which did not expire until 2003, was cancelled. Also in November 2001, the DOA authorized an emergency procurement by the DSS and DHH of new lease space.[4] By February 2002, all of the State employees were moved from the Plaza Tower to the new lease space.
From 1996 through 2002, the State employees who worked in the Plaza Tower continually made complaints, both verbal and written, regarding problems in the building, especially water intrusion.[5] The complaints regarding water intrusion included leaking windows, falling ceiling tiles, soaked carpet, broken water pipes, and overflowing toilets. Apparently due to the large volume of complaints, both the DSS and DHH implemented a protocol that employees channel their complaints regarding the building through their State supervisors rather than send their complaints directly to the building owner. Both the DSS and DHH Regional Administrators, Janice Briscoe and Claude Carbo, testified regarding the considerable amount of complaints they received. Summarizing the evidence regarding the employees' complaints, the trial court noted:
 Class representative Gina Recasner testified that within a month of moving into the building, a pipe burst leaving ankle-deep water and ruining equipment and that within three moths of moving into the building, another huge pipe broke. Ms. Recasner made her complaints of bowed ceiling tiles, incessant paint build-up, constant dirtiness, and malfunctioning elevators to Claude Carbo, regional *1136 administrator for DHH, often making several complaints a week.
 Class representative Sherry Watters testified that the windows in the building did not open, there were persistent leaks by all the windows and in the stairwell, wet ceiling tiles were frequently replaced, the sewerage in the restrooms overflowed often. She was directed to report building complaints to Onjewel Quinn, administrative specialist for DSS.
 Witnesses also testified that the building was regularly either too hot or too cold, smelled of urine and other foul odors, and that the carpet was constantly wet. These complaints were directed to supervisors and other administrators who assured DHH and DSS employees that the issues were being addressed.[6]
 Employee complaints remained constant throughout DHH and DSS's occupancy of the building totaling over two hundred written complaints and hundreds more verbal complaints.
The complaints were documented in memoranda and correspondence contained in the record.
In 1996, representatives of the DEQ and Kenneth Lanier, an Environmental Health Science Manager with the Louisiana Environmental Epidemiology and Toxicology Office of Public Health, were sent to the building to address these complaints. On this occasion, Mr. Lanier spoke with about one hundred employees. The employees' complaints regarding the building included thermal discomfort (the building was too hot or too cold), elevator malfunction, and toilets constantly overflowing. At this time, the employees' complaints regarding the adverse health effects they were experiencing included headaches, scratchy throat, runny eyes, stopped-up sinuses, and allergy-type symptoms. The employees were concerned that their adverse health effects were due to exposure to asbestos in the building. Both BAHA and the State assured the employees that they were not being exposed to asbestos in the Plaza Tower.[7] However, there is no indication in the record that either BAHA or the State made any attempt until 2001 to determine whether exposure to something else in the building was causing the employees to experience adverse health effects.
In August 2001, Mr. Lanier returned to the Plaza Tower to investigate a complaint by a DSS staff attorney, Clay Latimer.[8] In her complaint, Ms. Latimer voiced the *1137 following five concerns regarding the building: (1) mold was present on the seventeenth floor and had been noted in several locations; (2) ceiling tiles throughout the floor had water damage and were saturated to the point of falling; (3) leaking was especially bad during rain; (4) water and debris had fallen on computers, furniture, and the floor; although the carpet had been wet, it generally was not replaced; and (5) fourteen employees on the seventeenth floor were suffering from a variety of respiratory problems, headaches, and itches; several employees had been to physicians for their symptoms.
Based on his August 2001 walkthrough of the DSS offices, Mr. Lanier reported the following observations:
 In the storage room, there was green mold growing on a three foot section of the wall along the floor, water damaged ceiling tiles and overhead light housing, and stained carpet;
 In the conference room, there was a continuous leak, which had caused soaked ceiling tiles and carpet; there also were numerous rusted filing cabinets, wet furniture and equipment, and green mold on one wall;
 In fourteen offices on the seventeenth floor, there were water damaged ceiling tiles;
 In one office and in the hallway outside of another office there were small spots of black mold on the ceiling tiles; and
 The employees located in many of these offices reported extensive leaking during rain, especially near the windows.
In his August 2001 report, Mr. Lanier noted that the DHH employees reported the following health effects: headaches, respiratory infections, coughing, congestion, sneezing, sinus problems and infections, sore throats, achiness, flu-like symptoms, itching, and an increase in allergy symptoms.
Also in August 2001, Steve Mayer, the DSS Office of General Counsel, visited the Plaza Tower and personally collected samples for testing from the seventeenth and twenty-seventh floors.[9] In September 2001, Mr. Mayer received the testing results that established there was an abundance of Stachybotrys in the building. Thereafter, the DSS attorneys on the seventeenth floor were allowed to work out of satellite sites (at other regional offices).
In October 2001, Mr. Lanier, at the request of DHH legal services returned to the Plaza Tower. In his October 2001 report, Mr. Lanier noted with regard to the HVAC system[10] that the air handling systems had rust and slime mold in the drain pans and that one of the two cooling towers on the roof over the seventeenth floor was not functional. On this occasion, the DHH employees reported major water leaks during heavy rains, which resulted in ceiling tiles collapsing and damage to office equipment. One employee reported that a pipe had broken in her office over a year earlier, yet visible water stains were still on the wall in her office. Mr. Lanier further noted that his visual inspection of the DHH offices revealed the following common problems: water damage along the ceilings, walls, and around windows; *1138 blistering paint and plaster; and stained ceiling tiles and carpet as a result of prior water intrusion. Mr. Lanier still further noted that these problems had been observed on his previous inspection on the seventeenth floor and seemed to indicate a structural problem.
In his October 2001 report, Mr. Lanier noted that in interviewing DHH employees regarding health problems the employees' symptoms were attributed to the building if they met one or both of the following criteria: (i) symptoms were not present before working in Plaza Tower; and (ii) symptoms were only present when the employees were at work, i.e., symptoms disappeared when (or shortly after) they left the building. At this time, the DHH employees reported the following health problems: burning throat, headaches, sinus and respiratory problems, scalp problems, aggravated allergies, shortness of breath, and eye infections. Mr. Lanier further reported that "[w]ater-soaked materials will support mold growth, and mold growth was noticed throughout the offices. It is possible that the mold present on the 17th floor is causing or contributing to the reported symptoms."
In both Mr. Lanier's August 2001 and October 2001 reports, he made various recommendations of actions that should be taken to eliminate the mold problem. These recommendations included that anyone with health concerns consult their physician; that future water leaks be prevented; that damages from prior water leaks be repaired; that all mold be removed; that all ceiling tiles and carpeting that are or have been wet should be replaced; and that upholstered furniture that has been saturated with water and not dried within forty-eight hours be removed. Mr. Lanier's August 2001 report also noted that "porous materials such as carpeting, upholstered furniture, particleboard, and sheet rock [should] be discarded and replaced if not completely dried within 48 hours of saturation."[11]
As noted, in October 2001, the Class Representatives filed this suit. According to Sherry Watters, the impetus for the suit was a newspaper article some of the employees read in the summer of 2001 concerning toxic mold in a house.[12]
On October 30, 2001, five days after filing suit, the Class Representatives filed a Motion and Order to Permit Entry Onto Premises For Minor Destructive Testing and Request for Injunctive Relief. In response, the trial court issued a temporary restraining order prohibiting any environmental cleaning of the building pending the plaintiffs being allowed to conduct environmental testing of the premises. The trial court also issued a consent judgment ordering BG, the building management company, not to authorize any clean up of toxic substances until such testing was *1139 done. Alleging BG violated the trial court's order, the Class Representatives file a Rule for Contempt. Following a hearing, the trial court found BG in contempt for removing ceiling tiles, cleaning the HVAC system, and intentionally interfering with the testing by imposing delay tactics. The trial court imposed a sanction of $7,000 on BG. On appeal, this court affirmed the contempt judgment and the sanctions award. Watters v. Department of Social Services, 02-1425 (La.App. 4 Cir. 6/4/03), 849 So.2d 734, writ denied, 03-1854 (La.9/26/03), 854 So.2d 372 (Watters II).
In November 2001, the DSS, with the approval of the DOA, terminated its 1998 lease. In the notice of cancellation, three reasons were listed for cancelling the lease: (1) violations of the fire code (high-rise sprinkler requirements), (2) violations of asbestos regulations, and (3) chronic water leaks in the building that permitted mold to grow in the leased office space. The notice of cancellation included the following explanation regarding the chronic water leaks:
DSS took occupancy in August of 1998; in November of 1998, tiles and walls in 103 rooms had to be replaced due to water stains. Based on the following chronology of reported problems, it is apparent that the building has a serious water intrusion problem that you have yet to address. In fact, employees often complained that water would be allowed to drip indefinitely. This failure to properly address water leaks and the resulting dislodging of ceiling tiles have resulted in recent complaints of mold-induced maladies.
By February 2002, all of the State employees were moved out of the building. In preparation for the move, Ms. Watters testified that the State employees were assigned gloves, buckets, and bleach to wipe down file cabinets. The employees also were instructed to go through all the case files and to discard any moldy files.
In 2004, the Class Representative moved to certify the class. The trial court granted their motion, appointed them as the class representatives, and defined the class they represented as "any employee of the State of Louisiana who worked in Plaza Tower at any time from 1996 to the present, who has [ (sic) ] been exposed to toxic substances and all individuals assigned after the date of the filing of these proceedings. In Watters I, we affirmed the decision to certify noting that "the complaints of the class are traced to the Plaza Tower as a single source." Watters I, 05-0324, p. 15, 929 So.2d 267, 278. Although we found certification appropriate, we found merit to the State's argument that the definition of the Watters class was vague and remanded for "the trial court to determine whether a causal connection exists between the exposure to the toxic substance and the alleged injury sustained because it will alleviate the inadequacy as to vagueness and redefine the class." Watters I, 05-0324 at p. 17, 929 So.2d at 279.[13]
On January 8, 2007, the trial court rendered judgment redefining the Watters *1140 class as "[a]ll present or past employees of the State of Louisiana, who occupied the Plaza Tower Office Building from 1996 to the date of their departure from the building and who were exposed to fungal substances such as mold and mold spores which were growing on building materials and by the by-products of the mold and mold spores that were released into the air."[14]
In November 2007, a seven-day bench trial was conducted.[15] At trial, the following witnesses testified: (i) the five class representatives (Sherry Watters, Frances M. Breyne, Gina Recasner, Gretchen Wiltz, and Wendy Lemieux); (ii) Larry Townsend, the plaintiffs' expert in the fields of environmental engineering, microbial consulting, mechanical engineering, and mold remediation; (ii) Dr. Manuel Lopez, the State's medical expert who was board certified in immunology with a sub-board certified specialty in laboratory immunology; (iii) Dr. Kashmir Rai, the plaintiff's medical expert in family practice;[16] (iv) Sharon Reed, the DOA Real Estate Leasing Section Administrator; (v) Judge Mark Doherty, a former DSS staff attorney who worked in the Plaza Tower; (vi) Kenneth Lanier, an environmental health science manager with the Louisiana Environmental Epidemiology and Toxicology Office of Public Health; (vii) Steve Mayer, the DSS Office of General Counsel; and (viii) Janice Briscoe, the DSS Regional Administrator. The depositions of the following witnesses were introduced into evidence at trial: (1) Dr. David Straus, the plaintiffs' expert in microbiology; (2) Donna Davis, BG's Senior Operations Manager; (3) Claude Carbo, the DHH Regional Administrator; (4) Todd Page, a co-worker of Mr. Lanier; and (5) Schumann Rafizadeh, whose family owned the Plaza Tower. The parties also introduced photographs and video footage of the building, copies of the leases, and copies of other pertinent documents, including copies of the hundreds of written complaints.
On March 10, 2008, the trial court rendered judgment in favor of the Class Representatives awarding each of them $25,000 in general damages (for pain and suffering) plus an additional $10,000 for mental anguish and emotional distress. The trial court also awarded the remaining class members $10,000. The parties filed cross motions for new trial. The plaintiffs' attorneys also filed a motion to tax costs in the consolidated matters. On May 14, 2008, the trial court rendered judgment based on the stipulation of the parties deleting the $10,000 award to the remaining class members, but otherwise denied the motions for new trial. The trial court granted in part and denied in part the plaintiffs' motion for costs. The court denied the plaintiffs' attorneys' request for reimbursement of "equipment for trial, advanced fees for counsel, and plaintiffs' share of transcript fees for the trial," but ordered that the sum of $333,577.08 be taxed as reasonable court costs. This appeal by the State followed.

*1141 II.
This is a tort suit by the plaintiffs against their employer, the State, for failing to comply with its duty to provide a safe workplace. This duty arises from La. R.S. 23:13, which provides:
Every employer shall furnish employment which shall be reasonably safe for the employees therein. They shall furnish and use safety devices and safeguards, shall adopt and use methods and processes reasonably adequate to render such employment and the place of employment safe in accordance with the accepted and approved practice in such or similar industry or places of employment considering the normal hazard of such employment, and shall do every other thing reasonably necessary to protect the life, health, safety and welfare of such employees. Nothing in this Section shall apply to employment in private domestic service or to agricultural field occupations.
Generally, an employee's claim based on La. R.S. 23:13 would be under the Louisiana Workers' Compensation Act and not in tort. As the trial court noted in its reasons for judgment, this court recognized an exception to this general rule in a case virtually identical to this one, Ruffin v. Poland Enterprises, L.L.C., 06-0244 (La. App. 4 Cir. 12/13/06), 946 So.2d 695, writ denied, 07-0314 (La.4/20/07), 954 So.2d 163. In Ruffin, supra, this court held that clerical employees' claims against their state employer for exposure to mold in the workplace fell outside the scope of the Workers' Compensation Act because such exposures were not an accident, not an occupational disease, and not peculiar to or characteristic of clerical employment. Accordingly, this court held that workplace mold exposure could form the basis for a tort action against an employer. H. Alston Jonson III, 14 La. Civ. L. Treatise, Workers' Compensation Law and Practice § 366 (4th ed.)(noting that Ruffin narrowly construed the scope of the occupational disease provision).
The State contends that it is illogical to extend the duty to provide a safe workplace created by a provision of the Workers' Compensation Act, La. R.S. 23:13, to create a tort duty. The State further contends that the Ruffin case is distinguishable from this case in that it was based on the premise that the plaintiffs' claims sounded in tort, not in workers' compensation. We disagree. The basis for the tort claim in the Ruffin case, as in this case, was the employer's breach of its duty to provide a safe workplace. The failure of this court in the Ruffin case to cite La. R.S. 23:13 is a distinction without a difference. The trial court correctly found that the holding in Ruffin, supra, is dispositive of the Class Representatives' right to assert a tort claim against the State.
The State next contends that its respective agencies are not liable under La. R.S. 23:13 for claims made by persons who are not their respective employees. The State stresses that DOA, DHH, and DSS are separate legislatively created agencies. Since no plaintiff was a DOA employee, the State argues that the trial court legally erred in finding that DOA owed the plaintiffs a duty under that statute. The State likewise argues that it was legal error to find that DSS owed DHH employees a duty under that statute and that DHH owed DSS employees a duty under that statute. In support, the State cites Palermo v. Port of New Orleans, 04-1804 (La.App. 4 Cir. 1/19/07), 951 So.2d 425, writ denied, 07-0363 (La.6/13/07), 957 So.2d 1289, for the proposition that a finding of liability against a particular state agency under La. R.S. 23:13 is improper if the plaintiffs were not employees of that agency.
The State's reliance on the Palermo case is misplaced. The Palermo case involved *1142 dock workers who sued the dock board; the dock board undisputedly was not the dock workers' employer. Given those facts, we found no statutory or jurisprudential authority for imposing on the dock board the duty to provide the dock workers, who were not its employees, with a safe workplace. Palermo, 04-1804, p. 11 (La.App. 4 Cir.2007), 951 So.2d 425, 435; see also Morella v. Board of Com'rs of Port of New Orleans, 07-0864 (La.App. 4 Cir. 5/14/08), 988 So.2d 266, 270-71, writs denied, 08-2362, 08-2422 (La.1/16/09), 998 So.2d 100, 101. In contrast, the State was the employer of all the plaintiffs.
We further find, as the Class Representatives contend, that the real party in interest is the State, which through its various agencies employed all the plaintiffs. Roberts v. Sewerage and Water Bd. of New Orleans, 92-2048 (La.3/21/94), 634 So.2d 341, 350-51 (citing Wright v. Moore, 380 So.2d 172 (La.App. 1st Cir.1979))(reasoning that "each department does not have the legal capacity to function independently of the governor, but merely functions as an agency or division of the State of Louisiana.")
In sum, we find the liability for the actions or inaction of the various State agencies is the responsibility of the State as the real party in interest and that, given the Ruffin case, the plaintiffs have a tort claim.

III.
A tort claim is determined under a duty-risk analysis, which is applied on a case-by-case basis. Faulkner v. The McCarthy Corp., 02-1337, p. 4 (La.App. 4 Cir. 6/11/03), 853 So.2d 24, 28 (citing McGuire v. New Orleans City Park Improvement Ass'n, 02-1401, p. 6 (La.1/14/03), 835 So.2d 416, 420). The duty-risk analysis requires the plaintiff to establish the following five elements to prevail: (i) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries; (ii) the defendant owed a duty to the plaintiff; (iii) a breach of the duty; (iv) the defendant's substandard conduct was the legal cause of the plaintiff's injuries; and (v) damages. Perkins v. Entergy Corp., 00-1372, p. 7 (La.3/23/01); 782 So.2d 606, 611. The plaintiff must prove every element by a preponderance of the evidence. Riley v. Salley, 03-1601, p. 2 (La.App. 4 Cir. 4/21/04); 874 So.2d 874, 876. Factual findings (including breach of duty, cause-in-fact, legal causation, and actual damages) are subject to the manifest error standard of review. Snearl v. Mercer, 99-1738, p. 11 (La.App. 1 Cir. 2/16/01), 780 So.2d 563, 574. When the factual findings are based on the credibility of witness's testimony, the appellate court must give great deference to the fact finder's decision to credit a witness's testimony. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).

IV.
Causation is the first element of proof of a negligence claim. Quick v. Murphy Oil Co., 93-2267 (La.App. 4 Cir. 9/20/94), 643 So.2d 1291, 1295. Causation has been characterized as "the Achilles heel of a mold claim." Julie S. Elmer, A Fungus Among Us: The New Epidemic of Mold Claims, 64 Ala. Law. 109, 112 (2003)("Elmer"). Indeed, the State's primary argument on appeal is that the trial court erred in finding causation.[17] Plaintiffs *1143 in a mold personal injury case must establish causation on five different levels: (i) the presence of mold, (ii) the cause of the mold and the relationship of that cause to a specific defendant, (iii) actual exposure to the mold, (iv) the exposure was a dose sufficient to cause health effects (general causation), and (v) a sufficient causative link between the alleged health problems and the specific type of mold found (specific causation). Id.[18] To address the State's arguments regarding causation, we analyze the evidence presented at trial and the trial court's findings as to each of these five levels.
The presence of mold was documented not only by the testimony of the expert and lay witnesses, but also by the photographs, video footage, sampling test results, and multitude of documents in the record. As the trial court noted, "[s]everal witnesses testified regarding the constant water leaks, wet carpets and tile, and mold in the building." In particular, the trial court cited the testimony of Mr. Townsend, the plaintiffs' expert in environmental engineering, microbial consulting, mechanical engineering, and mold remediation. The court noted:
Mr. Townsend performed a walk-through of three floors of the Plaza Tower office building in 2001 in order to make a proposal for mold remediation. He also reviewed video footage taken by the A[i]mes Group while the state employees were still occupying the building. In reviewing this video, he noted mold on the ceiling ti[l]es, extensive water damage, efflorescence coming down on the walls, several water stains on fixtures and ceiling tiles, large water stains on the floor, and additional suspect mold growth. He also testified that the building contained mold hidden behind baseboards and tiles.
Based on his review of the mold sampling performed at the Plaza Towers, Mr. Townsend found there was an abundance of Stachybotrys in the building and in the air handlers that serviced the floors the State *1144 employees occupied. He explained that mold spores were circulated throughout the building by multiple means  the HVAC system, the return air plenums, and the piston action of the elevators traveling from floor to floor.[19]
As noted above, Mr. Lanier noted the widespread presence of mold in the Plaza Tower in his August 2001 and October 2001 reports. Dr. David Straus, plaintiffs' expert in microbiology, testified that the building had an obvious mold problem. The test results of the samples Mr. Mayer took in August 2001 established the presence of an abundance of Stachybotrys in the building.
The Class Representatives testified at trial regarding the continuous water intrusion problems and the presence of mold in the building.
Sherry Watters, who worked from September 1996 to February 2002 as a DSS staff attorney on the seventeenth floor of the Plaza Tower, testified that the stairwell located immediately behind her office was persistently wet and that the moisture apparently was unrelated to the weather. Ms. Watters testified that it was common practice for BG to change ceiling tiles and to fail to ever fix the leaks.
Frances Breyne, who worked from September 1996 until February 2002 on the seventeenth floor of the Plaza Tower as a DSS staff attorney, testified that she observed ceiling tiles being changed often either because of wet or brown growths or spots on them or because they were actually bowing out due to water intrusion. She testified that she was later told that the spots she observed on the ceiling tiles were black or toxic mold.
Gina Recasner, who worked from January 1997 to February 2002 as a DHH attorney in the Plaza Tower on the eleventh floor, testified that within a month of moving into the building a pipe broke and there was ankle deep water down the hall from her office. In April 1998, a pipe broke in the ceiling of Ms. Recasner's office. As a result, the carpet was wet for an extended period of time. The building owner used blowers to dry the carpet and never replaced it. The bathroom on the eleventh floor often had pipes break. The kitchen, which was on the other wall behind her office, had a pipe break that flooded the carpet in her office. In the offices in her area she observed bubbly paint around the windows, water stains on ceiling tiles, and bowed ceiling tiles. Although Ms. Recasner indicated that she never saw mold in the building, she testified that she saw "fungus-like stuff" on the windows. In August or September 2001, the presence of mold in the building was brought to her attention by Ms. Watters, who showed her black mold on a ceiling tile from the building. According to Ms. Recasner, throughout the time they occupied the building there was constant water intrusion. She testified that "the conditions of the Plaza Tower that existed in 2001 when the emergency [procurement] order was executed, existed in 1996, 1997, 1998, 1999, and 2000. It was bad throughout. It was not any worse in 2001."
Wendy Lemieux, who worked from October 1996 until August 2001 in the Plaza Tower as an adoption specialist for the DSS, testified that her job required her to move about the building. The most pronounced thing she remembered about the Plaza Tower was the musty, moldy smell *1145 she encountered every time she entered the building. She noted that the smell was present even on bright, sunny days and that it was present throughout the entire building. Another problem Ms. Lemieux noted was that the toilets in the bathrooms always overflowed. Ms. Lemieux testified that she saw mold in the building on ceiling tiles and described the mold as especially bad in her supervisor's office. She testified that she observed building workers changing the tiles in the halls and offices.
Gretchen Wiltz, who worked from September 1997 to October 2001 as a DSS social services supervisor on the fourteenth, fifteenth, and sixteenth floors of the Plaza Tower, described bulges on the walls of her office, which was located directly below Ms. Watters' office. She testified that she often took the stairs to go to Ms. Watters' office to consult with her on cases and that on one occasion water fell on her head. Ms. Wiltz testified that she observed water running down the windows and that the tiles in her office were often replaced.
Another fact witness was Judge Mark Doherty, a former DSS staff attorney who worked in the Plaza Tower from 1997 to 1999 when he retired to run for judge. Judge Doherty testified that while working in the building he observed bubbling plaster and fuzz on the wall of his office. He also observed discolored, water stained ceiling tiles, which would periodically crumble and drop down. Another water intrusion problem Judge Doherty noted was water on the floor in the men's bathroom, which would seep out over the threshold onto the carpet in the hallway. Although he did not see any visible mold in his office, he saw mold in the area around the men's bathroom.[20]
The source of the mold in the Plaza Tower was the long standing, continuous water intrusion into the building. The building owner's relationship to the mold was based on its dual capacity as owner and lessor. The State's relationship to the mold was based on its dual capacity as employer and lessee.[21]
Proof that mold is present in an indoor environment does equate to proof of actual exposure to mold. For actual exposure to occur, "fungal spores, fragments, or metabolites must be released into the air and inhaled, physically contacted (dermal exposure), or ingested." New York City Dept. of Health, Guidelines on Assessment and Remediation of Fungi in Indoor Environments § 2.3 (2000)("New York Guidelines").
Given that mold is ubiquitous (present in all environments), the State contends that the Class Representatives were required to establish that the level of mold they were exposed to in the Plaza Tower was higher than the level of mold in the outside environment. In support of this argument, the State cites the testimony of Dr. Lopez, its medical expert. Dr. Lopez testified that in order to determine if the concentration of mold spores in an indoor environment is significantly higher than the normal concentration it is essential to compare contemporaneously the mold concentration in the outdoor and indoor environments. The State also cites the New York Guidelines, supra, which state that "[i]f air monitoring is performed, for *1146 comparative purposes, outdoor air samples should be collected concurrently at an air intake, if possible, and in a location representative of outdoor air." Given the lack of contemporaneous outside air samples, the State contends that the trial court erroneously imposed liability on it based on the assumption that the quantity of mold in the Plaza Tower exceeded that which would be found anywhere else.
The Class Representatives counter that the lack of contemporaneous outdoor air sampling is not dispositive. They emphasize that the principal type of mold found in the building, Stachybotrys, is rarely found outdoors. They contend that the presence of Stachybotrys in inside air samples by itself was sufficient to prove the presence of harmful levels of mold in the building.
Dr. Straus, the plaintiffs' expert in microbiology, testified that the lack of contemporaneous outdoor air samples did not render it impossible to interpret the air sampling test results. Interpreting the test results, Dr. Straus identified two concerns.
First, Stachybotrys was shown to be present in the indoor air, which he described as worrisome because Stachybotrys is not an airborne mold. He explained that "[t]he reason that that is disconcerting is that Stachybotrys produces a relatively large, wet sticky spore, which we rarely find in the indoor air. I mean, you can find Stachybotrys in the room and not find any Stachybotrys spores in the air. Because the spores are so heavy, they really don't get into the air stream very easily. So just the finding of Stachybotrys in the air is disconcerting."
Second, "very, very high concentrations of Aspergillus" were found in one area. He noted that the Anderson air sampling plate was so overloaded with Aspergillus that a count could not be obtained of them.
As discussed above, Mr. Townsend, the plaintiffs' engineering expert, also testified regarding the presence of an abundance of mold in the building, including Stachybotrys. He explained that Stachybotrys is a "big, heavy, sticky mold spore" and that if it is found in the air it means there is a problem somewhere. He further testified that "Stachybotrys should not be in an air handling plenum. Actually it shouldn't be in the building."
As noted, the testing done by Mr. Mayer in 2001 indicated the presence of an abundance of Stachybotrys in the building. Likewise, Mr. Lanier's October 2001 report stated that Stachybotrys was found to be present in the ceiling tiles on the seventeenth and twenty-seventh floors that were tested. Dr. Rai, the plaintiffs' medical expert, expressly noted in her reports that she understood Stachybotrys was found in the building.
Taken together, we find the evidence in the record supports a finding of actual exposure. We thus turn to the final two elements: general and specific causation.
General causation  that exposure to mold can cause disease  was established at trial through Mr. Lanier's two reports (dated August 2001 and October 2001), and Dr. Straus' deposition testimony. In his reports, Mr. Lanier indicated that the symptoms the State employees were complaining about "can be reactions to mold, mold spores, or mycotoxins produced by mold." He explained that "[a]fter exposure to mold, mold spores, or mycotoxins produced by mold there is a potential to develop symptoms such as coughing, wheezing, runny nose, irritated eyes or throat, skin rash, or diarrhea" and that "[p]eople with allergies may be more sensitive to molds and experience more severe allergic reactions." In support, Mr. Lanier cited various scientific publications. Similarly, Dr. Straus, the plaintiffs' expert microbiologist, opined that the symptoms *1147 Mr. Lanier noted in his reports were consistent with mold exposure inside the Plaza Tower. By consistent, Dr. Straus explained that he meant the reported symptoms were what he would expect to see  and what the literature says we would expect to see  in individuals who work in mold-infested buildings.
Dr. Straus acknowledged the lack of any governmental or industry standards on what concentration of molds are harmful in the indoor air environment. He also acknowledged that it is impossible to determine what levels of mold are completely safe. Nonetheless, he testified that it is possible to determine unsafe levels of mold exposure. He explained that his scientific lab has developed guidelines pursuant to which they can determine if a building is in trouble. His lab has developed an idea of the concentrations of certain organisms, including Stachybotrys and Penicillium, that are known to cause problems in buildings. Insofar as what levels of these organisms cause problems, he testified that a strong correlation has been shown between any Stachybotrys growing on building materials, high levels of Penicillium in the air, and Sick Building Syndrome.
Sick Building Syndrome, according to Dr. Straus, describes situations in which building occupants complain of adverse health effects linked to the time they spend in the building, but no specific illness or cause can be identified. The adverse health effects generally abate when the occupants leave the building for a period of time. Dr. Straus noted that in 1982 the World Health Organization coined the term Sick Building Syndrome. Although the cause of this syndrome initially was unknown, Dr. Straus testified that "more and more is coming out that many of the `Sick Building Syndrome' cases are caused by mold exposure." He referred to peer-reviewed articles that show a correlation between certain symptoms  "lower respiratory symptoms, cough, phlegm, wheeze, or wheeze with dyspnea, which means difficulty in breathing"  and people who live in moldy homes. Dr. Straus testified that it has been determined that many Sick Building Syndrome cases  he estimated about ninety percent  are due to mold  infested buildings. He opined that such is the case with the Plaza Tower.
In finding the cause-in-fact element satisfied,[22] the trial court reasoned:
The class representatives in this case testified that they did not suffer from their reported symptoms before their work at Plaza Tower, and that they have not suffered the symptoms since. They also testified that they noticed that their symptoms disappeared when they went on vacations or were otherwise absent from the building for a significant period of time, and that the symptoms reappeared upon re-entering the building. Accordingly, this Court finds that ... the DHH and DSS employees in Plaza Tower would not have suffered the allergy-like symptoms, headaches, sore throats, watery eyes, and respiratory symptoms but for their exposure to mold and mold spores while at work in the building.
In finding causation, the State argues that the trial court erroneously relied on the Housley presumption of causation.[23] *1148 The State argues that the presumption is inapposite because several of the Class Representatives had health concerns both before and after occupying the Plaza Tower. We find it unnecessary to address whether the Housley presumption, which the trial court did not cite, applies. Instead, we find the trial court's finding of causation was based, albeit implicitly, on Dr. Straus' opinion that this is a Sick Building Syndrome case.
Consistent with the Sick Building Syndrome, the focal point of the evidence regarding medical causation was on the short-term adverse health effects the Class Representatives suffered during the period that they occupied the building (1996 to 2002) and immediately after they departed the Plaza Tower work environment. The evidence presented at trial supports the trial court's finding that the Class Representatives' symptoms subsided when they were away from building. The Class Representatives' testimony supporting that factual finding is summarized below:
 Sherry Watters: Ms. Watters testified that she noticed a pattern of only feeling cold-like symptoms and fatigue when she was at work or at the building. "When I go home on the weekends, I don't take naps on weekends. When I'm on vacation or have a couple of days off, I don't take naps. It was only on days that I had been in the building."
 Frances Breyne: Before beginning work in the Plaza Tower, Ms. Breyne had only minimal symptoms of occasional sinusitis and nasal drainage. After she began working in the building, Ms. Breyne reported that her symptoms escalated and that she began experiencing daily fatigue, headaches, nasal symptoms, sinus discomfort, coughing, watery eyes, and throat discomfort. When she left the building, her symptoms gradually subsided.
 Gina Recasner: Before working in the building, Ms. Recasner had a prior history of headaches and sinusitis, but no prior history of skin problems. After she began working in the building, the severity and frequency of her headaches and sinusitis increased, and she experienced noticeably itchy skin for the first time. She testified that, after taking a week long vacation to visit her family in California, she realized upon her return back that she felt much better when she was away from the Plaza Tower.
 Wendy Lemieux: Ms. Lemieux testified that after she began working in the building, she began to have watery eyes. She also had headaches and sinus problems more frequently. When she left the building she noticed a decrease in her headaches, watery eyes, and sinus problems. Ms. Lemieux testified that when she was in the building she was not feeling good and she "noticed that when [she] wasn't in the building, [she] was feeling better."
 Gretchen Wiltz: Ms. Wiltz testified that when she was working in the building she began to have chronic bronchitis, sinusitis, rhinositis, headaches, nose bleeds, fatigue problems, and depression. She acknowledged she had sinus and bronchitis before working in the building, but stated it was not as extreme. She testified that she related her symptoms to the building because when she left the *1149 building for periods of time, such as when she took sick leave, she would feel better; however, her symptoms would start over when she returned to work in the building. Ms. Wiltz testified that she occasionally has the same symptoms when she has to come in contact with old records that had been water damaged and had a mildew odor.[24]
The testimony of the Class Representatives regarding the short-term adverse health effects they experienced while employed in the Plaza Tower, summarized above, coupled with the testimony of Dr. Rai (the plaintiffs' medical expert) linking those health effects to their exposure to mold in the Plaza Tower, summarized below, supports the trial court's finding of specific causation.
Dr. Rai, a board certified family doctor who was admitted as an expert in family practice, testified that in 2007 she examined each of the Class Representatives at the request of their attorney.[25] Dr. Rai testified that she limited her opinion that the Class Representatives were adversely affected by their exposure to mold in the Plaza Tower to the findings set forth in a book the Institute of Medicine of the National Academies published in 2004 entitled Damp Indoor Spaces ("Damp Indoor Spaces"). According to Damp Indoor Spaces, sufficient evidence of an association exists between upper respiratory tract symptoms  including nasal congestion, rhinitis, allergic "hay fever," sneezing, runny or itchy nose, sinusitis, and sore throat  and exposure to mold. The phrase "sufficient evidence of an association" is defined in Damp Indoor Spaces to mean that "studies show an association between the agent and disease and chance, bias, and confounding were ruled out with reasonable confidence."
Dr. Rai opined to a degree of medical certainty that each of the Class Representatives was adversely affected by molds while employed at the Plaza Tower. Dr. Rai testified at trial (and stated in her reports) that when she examined the Class Representatives (in 2007), Ms. Watters, Ms. Breyne, and Ms. Recasner appeared apparently healthy; Ms. Wiltz did not look particularly healthy; and Ms. Lemieux's medical exam was unremarkable. Dr. Rai stated that the Class Representatives' descriptions of their exposure to mold were consistent with the depiction of mold exposure set forth in Mr. Lanier's August 2001 report. Dr. Rai stated in her reports that she understood Stachybotrys was found in the building.
*1150 Based on Damp Indoor Spaces, Dr. Rai opined that the following symptoms complained about by the Class Representatives were consistent with their exposure to mold:
 Ms. Watters' respiratory symptoms of nasal irritation, sinus discomfort, watery eyes, throat discomfort, and coughing;
 Ms. Breyne's respiratory symptoms of nasal irritation, watery eyes, throat discomfort, and coughing;
 Ms. Recasner's nasal symptoms, i.e., runny, blocked, or stuffy nose;[26]
 Ms. Lemieux's watery eyes, throat discomfort, weak voice, and swallowing problems;[27] and
 Ms. Wiltz's respiratory symptoms of nasal irritation, watery eyes, throat discomfort, and coughing.[28]
Dr. Rai noted the above symptoms that the Class Representatives complained about were shared with many of the other employees in the Plaza Tower.
Dr. Rai acknowledged that Damp Indoor Spaces indicated that there was insufficient evidence to find an association between mold exposure and dermal (skin) problems. Dr. Rai testified that Ms. Recasner was insistent that her skin problems were her main symptoms. For that reason, Dr. Rai testified that she attempted to relate Ms. Recasner's skin problems to her exposure to mold based on an article published two years after Damp Indoor Spaces: J-H. Park, et. al, Fungal and Endotoxin Measurements in Dust Associated with Respiratory Symptoms in a Water-Damaged Office Building, Indoor Air (2006). Dr. Rai stated that the 2006 article found "a very strong quantitative association between fungal measurements in dust and rash and/or itchy skin, meeting some of the criteria for a causal association." Dr. Rai also relied on this 2006 article to link Ms. Wiltz's skin complaints to her mold exposure.
The State argues that the trial court's finding of causation is erroneous because there is no scientific evidence of a causal *1151 connection between mold exposure and the Class Representatives' symptoms. The State further argues that Dr. Rai refused to testify that there was sufficient evidence to establish medical causation between the Class Representatives' exposure to mold and the symptoms at issue. Rather, Dr. Rai relied solely on Damp Indoor Spaces to opine that there was sufficient evidence of an association between mold and certain symptoms. The State emphasizes that an association is not the equivalent of causation. The State also emphasizes that certain of the symptoms at issue  headaches, sinusitis, and skin conditions  are not among the symptoms listed in Damp Indoor Spaces.
Dr. Lopez, the State's medical expert who was board certified in immunology with a sub-board certified specialty in laboratory immunology, testified that Dr. Rai's opinion that there was an association between the Class Representatives' symptoms and the mold in the Plaza Tower was not equivalent to a finding of causation. Distinguishing the concepts of association and causation, Dr. Lopez explained that an association is some type of link such as "I ate an apple and within five minutes I developed a severe headache." The link would be a temporal one, but not necessarily a cause and effect relationship. He further testified that simply because all other State employees who worked in the building made similar complaints did not validate the issue of causation in his mind. He still further testified that a psychogenic disease would be a possibility if "a group of attorneys read an article about toxic mold in a house in Chalmette and realize that there's mold in their office space and suddenly put two and two together and decide that everybody in the office building is sick because of exposure to mold."
Dr. Lopez pointed out that Dr. Rai neither diagnosed any of the Class Representatives with a specific disease, nor ran any objective tests. He explained that only about five percent of the population is allergic to mold; those individuals are said to be atopic and produce IgE antibodies. According to Dr. Lopez, absent IgE antibody production an individual is not allergic to that mold. He noted that the two recognized scientific methods for determining if an individual is allergic to mold are the skin prick test and the RAST (blood) test. (As to Stachybotry, there is no skin prick test, but a RAST (blood) test exists.) Although some of the Class Representatives were tested for allergies to mold, none of them tested positive.[29]
Summarizing the conflicting testimony of Dr. Rai and Dr. Lopez, the trial court noted that:
 Dr. Rai, the plaintiffs' medical expert, testified that symptoms such as headaches, sore throats, itching, and flu-like symptoms, such as those complained of by the state employees, are consistent with exposure to mold and mold spores. The conclusions drawn by Dr. Rai regarding mold and damp indoor spaces have been supported by articles from various organizations, including the Environmental Protection Agency.
 Dr. Lopez, the State's medical expert, testified that the fact that everyone in a building complains about certain symptoms does not equal causation or association. He further testified that he did not believe the symptoms DHH *1152 and DSS employees complained of can necessarily be attributed to their occupancy of the Plaza Tower office building.
Accepting Dr. Rai's opinion, the trial court concluded that "the weight of the evidence presented in the instant case supports the conclusion of a causal connection between the mold and mold spores in the Plaza Tower and the symptoms suffered by DHH and DSS employees."
The test for determining the causal relationship between the tortious conduct and subsequent injuries is whether the plaintiff proved through medical testimony that it was more probable than not that subsequent injuries were caused by the accident. Lasha v. Olin Corp., 625 So.2d 1002, 1005 (La.1993)(rejecting argument that a higher standard of "reasonable medical certainty" should be imposed). A trial court's finding of causation is a factual finding that should not be disturbed unless the record does not furnish a basis for that finding, and it is clearly wrong or manifestly erroneous. Ambrose v. New Orleans Police Dep't Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221. The manifest error rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. Sportsman Store of Lake Charles, Inc. v. Sonitrol Security Systems of Calcasieu, Inc., 99-0201, p. 6 (La.10/19/99), 748 So.2d 417, 421; McKenzie v. Cuccia, XXXX-XXXX, p. 6 (La.App. 4 Cir. 6/23/04), 879 So.2d 335, 339 (noting the deference granted to the fact-finder on appellate review extends to its assessment of expert testimony).
Based on the testimony of the Class Representatives regarding the short-term adverse health effects they experienced while employed in the Plaza Tower coupled with the testimony of Dr. Rai linking those health effects to exposure to mold in the building, we cannot conclude that the trial court's finding of specific causation is manifestly erroneous. Having found causation, we turn to the next element of the duty-risk analysis: breach of duty.

V.
The trial court found the State breached its duty to provide a safe workplace as required by La. R.S. 23:13. This statutory provision has been construed as requiring the employees to establish that their accident and injuries were caused by an unreasonable risk of harm created by the employer's failure to properly fulfill the duties imposed by the statute. O'Connor v. Litchfield, 03-0397 (La.App. 1 Cir. 12/31/03), 864 So.2d 234, 240-241; Jones v. Trailor, 93-2144 (La.App. 4 Cir. 4/28/94), 636 So.2d 1112. In its reasons for judgment, the trial court found the State breached its duty by exposing the plaintiffs to an unreasonable risk of harm as a result of requiring them to work in a mold-infested building. In reaching this conclusion, the trial court reasoned:
[A]llowing employees to continue working in an environment such as the one presented by Plaza Tower creates an unreasonable risk of harm. The state was aware of the constant water intrusions in the building and should have known that these water leaks could lead to substantial mold growth. Despite knowledge of the problems, the state did not take steps to provide a mold-free work environment for its employees, and the employees consequently suffered health problems. At any time over the six years DHH and DSS occupied the Plaza Tower office building, the state could have conducted a thorough investigation of the complaints regarding the building and the health of the state employees. The state failed to undertake any investigation in favor of passing any complaints on to the building owners *1153 who had made it quite clear that they did not intend to correct the serious problems with the building. As a result of this failure to act, state employees were exposed to mold and mold spores continuously over a six year period.
The State contends that the trial court failed to conduct the risk-utility balancing test required to find an unreasonable risk of harm, i.e., to balance the gravity and risk of harm against the individual and societal rights and obligations, the social utility, and the cost and feasibility of repair. The State further argues that the determination of an unreasonable risk of harm is a legal conclusion that is not protected by the manifest error rule. Contrary to the State's contention, the unreasonable risk of harm determination is subject to review under the manifest error standard. Reed v. Wal-Mart Stores, Inc., 97-1174, pp. 3-5 (La.3/4/98), 708 So.2d 362, 364-65.
In Reed, supra, the Louisiana Supreme Court resolved a conflict between the circuits regarding the applicable standard of review of a trial court's finding of an unreasonable risk of harm. The Supreme Court rejected Green v. City of Thibodaux, 94-1000 (La.App. 1 Cir. 10/6/95), 671 So.2d 399, cited by the State in its brief, and found the manifest error standard of review to be the proper standard. In so doing, the Supreme Court explained that "[b]ecause a determination that a defect presents an unreasonable risk of harm predominantly encompasses an abundance of factual findings, which differ greatly from case to case, followed by an application of those facts to a less-than-scientific standard, a reviewing court is in no better position to make the determination than a judge or jury." Reed, 97-1174 at p. 4, 708 So.2d at 364-65.
The State next contends that the trial court's finding that it had a duty to provide a "mold-free work environment" is erroneous given that mold is ubiquitous. Read in context, we understand the trial court's statement to mean that the State had a duty to provide a safe work environment, as required by La. R.S. 23:13.
In support of its argument that the record does not support the trial court's finding that the Plaza Tower was an unsafe work environment, the State cites the testimony of Mr. Lanier, who was a registered sanitarian,[30] that the building was not an imminent health threat. The State quotes Mr. Lanier's testimony that "[i]t's not a good situation to work in, but it's probably not even a bad situation for most people. It would have really only been a bad situation for people who have preexisting respiratory diseases like asthma and they shouldn't be working in that environment." The State also cites the New York Guidelines, which provide that "[e]xcept in cases of widespread fungal contamination that are linked to illnesses throughout a building, building-wide evacuation is not indicated." As noted elsewhere, the State stresses that Mr. Lanier did not include among his recommendations that the building be evacuated.
The Class Representatives counter that Mr. Lanier's failure to find the building presented an imminent health threat or to recommend an evacuation is not dispositive of whether the building presented an unreasonable risk of harm. We agree. The trial court was presented with other evidence regarding the health dangers posed by the mold-infested building. In his two reports Mr. Lanier referenced the potential adverse health effects posed by exposure to mold in the building. Both the State and the building owner were aware *1154 in 1996 of the State employees' complaints regarding their adverse health effects. In 1996, the employees were concerned that their adverse health effects were due to asbestos exposure. Although both the State and the building owner assured the employees that asbestos was not a concern, neither the State nor the building owner made any effort until 2001 to determine whether some other problem with the building was causing the employees' adverse health effects.
Even though the State forwarded complaints to the building owner regarding the continuous chronic water intrusion problems in the building and requested the building owner make repairs, the State, as Mr. Townsend testified, failed to impose any fixed timetable on the building owner for making repairs. The State, as the trial court noted, failed to terminate the lease or move its employees from the building after it became clear that the building owner was not going to fix the chronic water intrusion problem. Applying the manifest error standard, we conclude that the trial court's finding that the State breached its duty to provide a safe workplace is supported by the evidence.
The final element of the duty-risk analysis is damages. Addressing the damages element, the trial court expressly found the Class Representatives established they suffered personal damages reasoning:
The credible testimony of plaintiffs establishes that they suffered personal damages due to their exposure to mold and mold spores during their occupancy of the Plaza Tower office building. Their testimony is supported by the testimony of Dr. Rai establishing that their health complaints are consistent with such mold exposure.
The State's argument on damages is two-fold. First, the State questions the Class Representatives' proof of damages, in general, due to their failure to submit any claim for special damages. None of the Class Representatives presented evidence of any medical expenses they incurred in relation to the symptoms they attributed to the Plaza Tower. Second, the State contends that the amount awarded to each Class Representative  $25,000 in general damages and $10,000 in emotional distress damages  was an abuse of discretion.
As to the first part of the State's argument, we find, contrary to the State's suggestion, that the lack of a claim for special damages is not inconsistent with an award of general damages. General and special damages are two separate, independent categories of recoverable tort damages. See Wainwright v. Fontenot, 00-0492 (La.10/17/00), 774 So.2d 70, 78 (finding an award of $1,500 in medical expenses  special damages  was not inconsistent with a denial of general damages).
The second part of the State's argument relates to the quantum of the award. When the trier of fact (in this case, the trial judge) has made a general damage award and the defendant (in this case, the State) is contending that award is excessive, the abuse of discretion standard of appellate review applies. Dixon v. Travelers Ins. Co., 02-1364, p. 9 (La.App. 4 Cir. 4/2/03), 842 So.2d 478, 484-85. The abuse of discretion standard is difficult to express and necessarily is "non-specific." Cone v. National Emergency Services, Inc., 99-0934, p. 8 (La.10/29/99), 747 So.2d 1085, 1089. The jurisprudential theme that has emerged is that "the discretion vested in the trier of fact is `great,' and even vast, so that an appellate court should rarely disturb an award of general damages." Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993). It is only when the award is, in either direction, *1155 beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn, 623 So.2d at 1260. Under the circumstances presented in this case, we find no abuse of discretion in the trial court's damage award to each of the five Class Representatives.

VI.
The State asserts that the trial court erred in failing to apply the following three affirmative defenses: (a) comparative fault, (b) prescription, and (c) discretionary function immunity. We separately address each defense.

(a) comparative fault
Whether comparative fault under La. C.C. art. 2323 applies in a given case is a factual determination governed by the manifest error standard of review; hence, "[o]nly if the apportionment of fault is found to be clearly wrong can an appellate court adjust percentages." Ambrose v. McLaney, 06-1181, p. 10 (La.App. 4 Cir. 5/16/07), 959 So.2d 529, 536 (citing Maldonado v. Louisiana Superdome Comm'n, 95-2490, p. 10 (La.App. 4 Cir. 1/22/97), 687 So.2d 1087, 1093) (citing Clement v. Frey, 95-1119, pp. 7-8 (La.1/16/96), 666 So.2d 607, 610-11). The Louisiana Supreme Court has admonished that "allocation of fault is not an exact science, or the search for one precise ratio, but rather an acceptable range, and that any allocation by the factfinder within that range cannot be `clearly wrong.'" Foley v. Entergy Louisiana, Inc., 06-0983, p. 32 (La.11/29/06), 946 So.2d 144, 166. The same principles that apply to a quantum assessment apply to a fault allocation. Only after determining that the fault allocation is manifestly erroneous can an appellate court disturb the award, and then only to lower or raise it to the highest or lowest point, respectively, reasonably within the trial court's discretion. Duncan v. Kansas City Southern Railway Co., 00-0066, pp. 10-11 (La.10/30/00); 773 So.2d 670, 680-81.
In comparing fault, we apply the oft-cited list of factors enunciated in Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967, 974 (La.1985): (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) whether the capacities of the actors were superior or inferior; (5) whether any extenuating circumstances required to actor to proceed without proper thought, and (6) the relationship between the actor's conduct and the harm to the plaintiff. These factors also guide an appellate court's decision as to the highest or lowest percentage of fault that can reasonably be assessed. Duncan, 00-0066 at pp. 10-11, 773 So.2d at 680-81.
The State contends that the trial court erred in failing to assign any fault to the building owner given its de facto determination that the Plaza Tower was defective coupled with the Class Representatives' judicial admission in their petition, which is supported by the evidence in the record, that "[p]ursuant to Louisiana law, Plaza Tower's agents and owners had the care, custody and control of Plaza Tower." The State suggests that the building owner should have been assessed all or substantially all (at least 90%) of the fault.
The Class Representatives counter that the burden was on the State to establish the affirmative defense of comparative fault on the part of the building owner, a settling tortfeasor. They emphasize that the State's liability was based on its dual capacity as lessee of the building and as *1156 their employer. Regardless of its lease obligations, the State had an obligation to provide a safe work environment for its employees. Continuing, they argue that under the three leases the State had the option of repairing and deducting the costs from the rent, or cancelling and vacating the premises after giving the building owner notice. They contend that the vast portion, if not all, of the fault in this case is attributable to the State's inactivity for five years. Based on this time frame, they suggest a reasonable reallocation of fault would be 95% to the State (for its five years of inactivity) and 5% to the building owner (for the two to three months it failed to make repairs).
In addressing this issue, we first note, as discussed earlier, that the trial court's finding that the State is at fault for breaching its duty to provide a safe workplace is not manifestly erroneous. Nonetheless, we agree with the State that the trial court erred in failing to assess any fault on the building owner based on a premises liability theory under La. C.C. art 2322.[31]
As stated above, both the State and the building owner were aware in 1996 of the State employees' complaints regarding conditions in the building and their adverse health effects. Both the State and the building owner assured the employees that asbestos was not a concern. Both the State and the building owner failed to make any effort until 2001 to determine whether some other problem with the building was causing the employees' adverse health effects.
Under all three leases, the building owner assumed the responsibility to maintain the interior and exterior of the building, and to perform janitorial service in the leased spaces. Section 16 of each of the leases provided:
Lessor agrees to do at Lessor's expense such painting and other maintenance to the exterior of the building as is necessary to maintain the building in good condition and appearance. ... Lessor shall have sole responsibility for all maintenance and repair to the heating and air conditioning systems, plumbing systems (including plumbing fixtures), sewerage disposal systems (including septic tanks), electrical systems, light fixtures (including replacement of light bulbs and fluorescent tubes), and all other equipment furnished by the Lessor. The Lessor shall be responsible for maintaining the entire building and site in good condition throughout the term of the lease. Lessor shall make all such repairs to the premises as may become necessary because of breakage or other damages not attributable to the negligence of the Lessee, its agents, or its employees. Lessor shall be responsible for any damages to Lessee's employees, agents, invitees, visitors, and property and/or equipment that are a result of Lessor's negligence to properly maintain the premises.
The evidence presented at trial established that the State did not have the responsibility to maintain the building and that it leased only a portion of the building. Mr. Townsend, the plaintiffs' engineering expert, testified that the building's *1157 mechanical rooms, air handlers, air plenum, exterior walls, roofs, and other building components, such as the elevator shafts, that caused and spread mold spores throughout the building were located outside of the State's leased space. The building owner was thus in a superior position to repair and maintain the Plaza Tower.
The record further reflects that the building owner's conduct in failing to fulfill its obligations to repair and maintain the building was not inadvertent. Donna Davis, BG's Senior Operations Manager from 2001 to 2002, testified by deposition that during the time she was employed for BG she kept a detailed business journal. In her journal, she made several entries regarding the building owner's deliberate failure to maintain the building. We find the following entries especially enlightening:
 October 16, 2001: Schumman [Rafizadeh, whose family owned the Plaza Tower and who ran the building] says we must go in and clean the air handler rooms, change all return air filters, remove water standing in pans, and pour Clorox down bathroom floor drains. He also instructed me to hire an environmental company to go in and "assist" our janitorial company with the cleaning of the building prior to the court ordered inspections. I refused. We are not supposed to touch/disturb anything.
 October 30, 2001: Court ordered air inspection and TRO official. Schumman said to immediately replace all filters on all state floors and in air handler rooms. Ben will call Quality Environmental to initiate extra clean up. I refused to participate. ... Schumann says regular cleaning is ok but environmental cleaning is what is not permitted. (Schumman's idea of "regular" cleaning is an environmental clean up.)
 November 9, 2001: Schumman says we will only permit the state to sample what goes out of the air handler rooms; not what comes in. I told him we did not have the power to tell the court what we will or will not allow.
 January 23, 2002: The roof of the 17th floor at Plaza has leaked for 2+ years. When it rained it flooded large areas of the 17th floor. I obtained numerous bids to repair/replace the roof deck where the leaks were. Schumman said it was way too much money. He ordered me to go to Home Depot and buy tile sealant and coat the roof tiles. He insisted this would work. We applied 4 or 5 coats which stopped the leaks for only 1 month.
As noted, in Watters II, supra, we affirmed the trial court's finding that BG was in contempt for willfully violating the trial court's consent judgment by removing moldy ceiling tiles from restricted areas, cleaning the HVAC system, and delaying the testing. Based on the unrefuted testimony that "several HVAC system components were wrapped in fresh tape, which concealed a black powdery substance, and that air conditioning drip pans had been replaced," we found that BG's maintenance personnel had cleaned the HVAC system in violation of the trial court's consent judgment. Watters II, 02-1425 at p. 10, 849 So.2d at 740. We further found that "the unrefuted testimony that BG maintenance personnel removed moldy ceiling tiles from restricted areas during the testing period supports the trial court's finding that BG willfully violated the consent judgment." Id.
The record reflects that the building owner engaged in a significant amount of cosmetic repairs, including constantly changing ceiling tiles, but failed to fix the underlying causes of water intrusion problem. *1158 The State admits in its brief that the building owners "failed to make complete and permanent repair of some water leaks that may have encouraged mold growth in certain areas of the building." Sharon Reed, the DOA Real Estate Leasing Section administrator, testified that although the building owner typically responded to complaints, it often performed a "band aid fix." Similarly, Ms. Watters testified that the building owners would "cosmetically fix" the water intrusion problem and leave a gaping hole in the ceiling dripping. She further testified that the building owner "would just put a new ceiling tile in until the next ceiling tile got a stain, fell, and we would repeat the whole process." The building owner also exacerbated the problem by certain of its actions such as bringing in blowers to dry, instead of changing, soaking wet carpet.
Given that the building owner purposefully allowed a persistent water intrusion problem that in turn resulted in the growth of an abundance of mold, we find a significant percentage of the fault should have been allocated to the building owner. Applying the Watson factors, we find the lowest amount of fault that could have been allocated to the building owner is 65%. We thus amend the judgment to reduce the fault allocated to the State from 100% to 35%.

(b) prescription
A tort action is subject to a one year prescriptive period. La. C.C. art. 3492. Prescription on a tort claim commences to run on the date that injury or damage is sustained. Cole v. Celotex Corp., 620 So.2d 1154, 1157 (La.1993). As the State points out, the Class Representatives alleged in their petition that they first suffered harm as a result of the conditions in the Plaza Tower in 1996. The State further points out that the State employees made the same complaints in 1996 as they did in 2001 regarding the conditions in the building and the adverse health effects they were sustaining. The State thus contends that because the Class Representatives' knowledge of the basis for their complaint was the same in 1996 as it was in 2001, the Class Representatives suit filed in October 2001 was untimely and should have been dismissed as prescribed. The Class Representatives counter that their claims are not prescribed because the continuing tort doctrine applies.[32]
The continuing tort doctrine is a jurisprudentially recognized exception to the general rules of prescription. Under the continuing tort doctrine, when the cause of injury is a continuous one giving rise to successive damages, prescription does not begin to run until the conduct causing the damage is abated. South Central Bell Telephone Co. v. Texaco, Inc., 418 So.2d 531, 533 (La.1982); Bustamento v. Tucker, 607 So.2d 532 (La.1992); Risin v. D.N.C. Investments, L.L.C, 05-0415, p. 4 (La.App. 4 Cir. 12/7/05), 921 So.2d 133, 136. Stated otherwise, "if both the tortious conduct and the damages continue, the tort may be deemed a `continuing' one and prescription may not begin to run until the wrongful conduct ceases." Frank L. Maraist and Thomas C. Galligan, Louisiana Tort Law, § 10-4(e)(1996).
The jurisprudence has applied the continuing tort doctrine in the context of workplace exposure to toxic substances. Coulon v. Witco Corp., 03-208 (La.App. 5 Cir. 5/28/03), 848 So.2d 135, 138, and Wilson v. Hartzman, 373 So.2d 204 (La.App. 4th Cir.1979). In Wilson, supra, the plaintiff alleged that he was exposed at work to *1159 toxic substances (silica dust) on a daily basis and that such exposure continued until his final day on the job. In rejecting a claim that the plaintiff's claim was prescribed, we reasoned:
[T]he continuing and repeated wrongful acts are to be regarded as a single wrong which gives rise to and is cognizable in a single action, rather than a series of successive actions. Therefore, the date for commencing the accrual of prescription of an action based on the single wrong is the date of the last wrongful exposure, and the single action may be filed within the prescriptive period reckoning from the cessation of the continuing wrongful acts.
Wilson, 373 So.2d. at 207 (citations omitted).
Simlarly, in Coulon, supra, the plaintiff claimed regular exposure in the workplace to potentially harmful chemicals. Citing Wilson, supra, the court reasoned:
[R]egardless of Coulon's knowledge of his possible injuries or the possible cause, the alleged tortious conduct was continuous and gave rise to damages from day to day. Therefore, prescription did not begin to run until the alleged cause of the damages was abated, or the last day of Coulon's employment, which was the last day he was exposed to the potentially harmful chemicals.
Coulon, 03-208 at pp. 6-7, 848 So.2d at 138.
This case is similar to the Coulon and Wilson cases. The State's actions in allowing the Class Representatives to continue working in a mold-infested building constituted a continuing tort that continually caused them damage. Prescription on their claims did not commence to run until the State moved its employees out of the Plaza Tower. Since this suit undisputedly was filed before then, it was not prescribed.[33]

(c) discretionary function immunity
The State argues that the sole basis for the plaintiffs' claims was the discretionary conduct of its employees who had the decision making authority regarding whether the DSS and the DHH employees would continue occupying the Plaza Tower while the agencies were working to resolve the lease issues and searching for replacement office space. The State argues that the only two State agency employees who had that discretionary authority to relocate their agencies' offices out of the Plaza Towers if emergency circumstances so warranted were the DSS and DHH Regional Administrators, Mr. Carbo and Ms. Briscoe. Seeking authority to procure alternative lease space on an emergency basis, the State contends, is a discretionary function protected by La. R.S. 9:2798.1.
The Class Representatives, on the other hand, contend that the State's decisions regarding housing its employees in an unsafe work environment were not discretionary because La. R.S. 23:13 required the State to provide a reasonably safe work environment for its employees. They further contend that the State's decisions regarding the location at which its employees worked were operational in nature and that the State cannot prove these decisions were grounded in social, economic, or political policy.
*1160 The meaning of the phrase "policy making or discretionary act" in the discretionary function immunity statute, La. R.S. 9:2798.1,[34] was addressed by the Louisiana Supreme Court in Gregor v. Argenot Great Cent. Ins. Co., 02-1138 (La.5/20/03), 851 So.2d 959. The Gregor case was a suit against the DHH for negligent enforcement of the sanitary code. The DHH's conduct at issue was its failure to require a restaurant to post a warning sign regarding the dangers of eating raw oysters. Interpreting La. R.S. 9:2798.1, the Court found the analysis of La. R.S. 9:2798.1 in Fowler v. Roberts, 556 So.2d 1, 15 (La. 1990), and its progeny was faulty because it was based on the Federal Tort Claims Act, which was worded differently than the Louisiana statute, La. R.S. 9:2798.1. The Court held that the language of La. R.S. 9:2798.1 is clear and unambiguous and has to be interpreted as written. Applying the statute, the Court held that the DHH had a mandatory statutory duty to properly enforce the sanitary code. The Court further reasoned that the DHH's mistaken decision that the warning over the oyster bar was in compliance with the sanitary code "was not a decision grounded in social, economic, or political policy. It was operational negligence in enforcing the sanitary code." Gregor, 02-1138 at p. 13, 851 So.2d at 968. The Court stated that "[w]hen the government acts negligently for reasons unrelated to public policy considerations, it is liable to those it injures." Id. The Court thus held that the DHH was not entitled to immunity under La. R.S. 9:2798.1.
We find, as in Gregor, supra, that the State had a mandatory statutory duty to provide a safe workplace for its employees under La. R.S. 23:13 and thus was not entitled to immunity under La. R.S. 9:2798.1.

VII.
The last issue that the State raises on appeal is whether the trial court's award of court costs was excessive.[35] As noted, the trial court granted in part and denied in part the plaintiffs' attorneys' motion for costs expended in the consolidated matters. The total amount the trial court taxed as court costs was $333,577.08. This amount was calculated by deducting from the total amount the plaintiffs' attorneys originally sought ($362,573.13) the following two categories of costs:
(1) the costs pertaining to storage fees, miscellaneous expenses, interest, and related items, which totaled $23,988.08;[36] and

*1161 (2) the costs for certain items related to equipment for trial, advanced fees for counsel, and plaintiffs' share of transcript fees for the trial, which totaled $5,007.97.[37]
The State contends that the costs award is erroneous for several reasons. First, it contends that $313,873.78 of the $333,577.08 awarded is duplicative of a previous award of costs to the plaintiffs' attorneys. In support, the State cites the trial court's October 13, 2004 judgment regarding the plaintiffs' settlement with the compromising insurers of the Plaza Tower and its owners. The October 13th judgment included the following provision: "[c]ourt costs expended by plaintiffs counsel in the amount of $313,873.78 shall be paid to lead counsel." The State points out that this amount was actually paid to plaintiffs' attorneys. The State thus contends that the costs for this litigation have been paid up through October 13, 2004. The State also emphasizes that the plaintiffs' attorneys relied on the October 13th judgment as proof that they had incurred $313,873.78 in court costs through that date. We find the parties' reliance on the October 13th judgment misplaced. The costs recoverable as part of a class action settlement are not equivalent to the costs recoverable as court costs. For the same reason, plaintiffs' attorneys' reliance on La. C.C.P. art. 595 as supporting the trial court's cost award is misplaced; Article 595 applies only when a fund has been created in a class action.[38]
Citing the principle that each consolidated case retains its separate identity, the State contends that the trial court erred in taxing costs against it for all three consolidated cases. As noted earlier, this case was consolidated with two other cases arising out of alleged exposure to mold in the Plaza Towers: the Rhodes case and the Johnson case. The State points out that it is not a defendant in the Rhodes case and that the Johnson case has not yet been tried. Although we recognize the separate procedural identity of each of these cases, we also recognize the reality that costs may be incurred for the benefit of more than one case. For example, the plaintiffs' attorneys state that the depositions were noticed in all three cases. To the extent common costs were incurred in the consolidated cases and those costs satisfy the criteria discussed below for taxable court costs, those costs are recoverable.
The State still further contends that only a fraction of the costs the plaintiffs' attorneys seek are properly taxable as costs under the jurisprudence. The State emphasizes that the plaintiffs' attorneys had the burden of proving each cost they sought to tax as well as the actual relationship of that cost to this litigation. The State contends that the plaintiffs' attorneys failed to properly document their claim even for certain costs that under the jurisprudence would otherwise be recoverable. Illustrative, the State cites the plaintiffs' attorneys' inclusion in their lengthy listing of expenses amounts paid to the civil sheriff and the clerk of court without any explanation. The State submits that merely listing those expenses was not adequate proof that those expenses were recoverable costs. Given these deficiencies in the plaintiffs' attorneys claim for court costs, the State requests *1162 that we reverse the trial court's award of cost and order each party to bear its own costs. The Class Representatives counter that the trial court's award of costs was not an abuse of its discretion.
A trial court has great discretion in awarding costs (including expert witness fees) and can only be reversed on appeal upon a showing of an abuse of that discretion. Pelleteri v. Caspian Group Inc., 02-2141, p. 19 (La.App. 4 Cir. 7/02/03), 851 So.2d 1230, 1241 (citing Mossy Motors, Inc. v. Sewerage & Water Bd. of City of New Orleans, 01-0486 (La.App. 4 Cir. 9/19/01), 797 So.2d 133); Jacobs v. Loeffelholz, 94-1123 (La.App. 4 Cir. 12/15/94), 647 So.2d 1282, 1287. The governing statutory provisions regulating the recovery of court costs are La. C.C.P. art.1920, La. R.S. 13:4533, and La. R.S. 13:3666. The Code of Civil Procedure article 1920 provides that "[e]xcept as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable."
"Article 1920 does not mean that there are no guidelines to govern the taxing of costs." Johnson v. Marshall, 202 So.2d 465, 469 (La.App. 1st Cir.1967). One guideline is that only costs provided for by positive law are taxable against the party cast in judgment. Moolekamp v. Rubin, 562 So.2d 1134, 1136 (La.App. 4th Cir.1990)(citing Gore v. American Motorists Ins. Co., 244 So.2d 894 (La.App. 1st Cir.1971)). The jurisprudence has recognized that the types of costs recoverable as court costs are narrowly defined by statute. Tipton v. Campbell, 08-0139, pp. 26-28 (La.App. 4 Cir. 9/24/08), 996 So.2d 27, 44-46. The types of costs that are allowed to be taxed as costs are defined in La. R.S. 13:4533 as "the costs of the clerk, sheriff, witness' fees, costs of taking depositions and copies of acts used on the trial, and all other costs allowed by the court."
Expert witness fees for testifying at trial and for time spent preparing for that testimony are recoverable. Yuspeh v. Koch, 02-1179, p. 3 (La.App. 5 Cir. 5/28/03), 848 So.2d 96, 98 (citing Smith v. Roussel, 00-1672 (La.App. 1 Cir. 6/22/01), 808 So.2d 726); Orea v. Scallan, 32,622 (La.App. 2 Cir. 1/26/00), 750 So.2d 483, 493-94. The trial court is required to determine the reasonable amount of expert witness fees to be taxed as court costs based on "the value of time employed and the degree of learning or skill required." La. R.S. 13:3666(A). The amount actually billed by the expert is not determinative of the reasonable amount taxable as costs. Yuspeh, supra (citing Mossy Motors, supra).
The costs of depositions "used at trial" are recoverable. Boutte v. Nissan Motor Corp., 94-1470 p. 13 (La.App. 3 Cir. 9/13/95); 663 So.2d 154, 162. However, to be considered "used at trial" for purposes of La. R.S. 13:4533, a deposition must be introduced and accepted into evidence. Succession of Franz, 242 La. 875, 883, 139 So.2d 216, 219 (1962). Thus, the costs of depositions that are not used at trial, including the fee of the deponent giving the deposition and the court reporter fees, are not taxable as costs. Moran v. Harris, 93-2227 p. 3 (La. App. 1 Cir. 11/10/94); 645 So.2d 1248, 1250.
Examples of litigation expenses that are not recoverable as costs because they are outside the scope of La. R.S. 13:4533 include "duplication costs of various documents and medical reports not used on the trial, postage and telephone charges, as well as plaintiff's food and lodging during the trial." Boleware v. City of Bogalusa, 01-1014, p. 9 (La.App. 1 Cir. 12/20/02), 837 So.2d 71, 77-78 n. 12 (citing Degruise v. Houma Courier Newspaper *1163 Corp., 00-0229 (La.App. 1 Cir. 3/28/02), 815 So.2d 1074, 1081).
In tort cases, a court may allocate costs between the parties on the basis of percentages of fault. See Frank L. Maraist and Harry T. Lemmon, 1 Louisiana Civil Law Treatise, § 12.4, n. 10 (1999)(noting that a court may "apportion costs in the same percentages as the court determines the fault of the defendant bears to the negligence of the plaintiff" and collecting cases in which costs have been allocated on the basis of percentages of fault). However, as expressly stated in La. C.C.P. art.1920, the trial court may assess costs in any equitable manner. See Gauthier v. Wilson, 04-2527, p. 10 (La. App. 1 Cir. 11/4/05), 927 So.2d 383, 390.
Applying these principles, we find the record does not support the court costs figure awarded by the trial court. After reviewing the documentation provided to the trial court by plaintiffs' attorneys in support of the motion to tax costs, we have arrived at the following amount awardable as reasonable court costs: $23,302.98.

DECREE
For the foregoing reasons, the judgment of the trial court is amended in the following two respects: to reduce the allocation of fault to the State from 100% to 35%, and to reduce the amount awardable as reasonable court costs from $333,577.08 to $23,302.98. In all other respects the judgment of the trial court is affirmed.
JUDGEMENT AMENDED AND AS AMENDED, AFFIRMED
ARMSTRONG, C.J., concurs.
LOVE, J., Concurs in Part and Dissents and Assigns Reasons.
BONIN, J., Concurs in Part and Dissents in Part with Written Reasons.
ARMSTRONG, C.J., concurs.
I respectfully concur in the result reached by the majority.
LOVE, J., Concurs in Part and Dissents and Assigns Reasons.
I concur in the result in Sections I, II, III, IV, V, VI(b) and VI(c). I dissent from Section VI(a) in that I find the trial court's apportionment of fault within an acceptable range. I dissent from Section VII for the reasons assigned by Judge Bonin.
The determination of whether comparative fault applies in a particular matter is a factual determination, which is subject to the manifest error standard on appellate review. Clement v. Frey, 95-1119, p. 7 (La.1/16/96), 666 So.2d 607, 610-11. Further, an appellate court can only adjust percentages if the apportionment of fault is found to be clearly wrong. Id. at pp. 7-8, 666 So.2d at 611. As this Court stated in Riley v. Reliance Insurance Company, allocation of fault is not an exact science, or the search for one precise ratio, but rather an acceptable range, and that any allocation by the fact finder within that range cannot be "clearly wrong." 97-0445, pp. 6-7 (La.App. 4 Cir. 11/19/97), 703 So.2d 158, 163
The majority states that the evidence adduced at trial established that the State did not have a responsibility to maintain the building and that it leased only part of the building. Further, the majority cites the testimony of Mr. Townsend, the plaintiffs' engineering expert, who testified that areas that caused the spread of mold spores throughout the building were located outside the State's leased space. The majority concludes that a significant percentage of the fault should have been allocated to the building owner for "purposefully allow[ing] a persistent water intrusion problem that in turn resulted in the growth of an abundance of mold...."
*1164 However, I do not find that the State's burden was lessened by having leased space in one portion of the building where working employees' complained while the problem stemmed from another area in the building. The State had the option of either making repairs and deducting their expenses from payments under the lease or cancelling their lease and vacating the building after giving the building owner notice. I find support for the fault determination within the range that the trial court allocated in the State's failure to provide a safe workplace and unreasonable actions after learning of State employees' complaints about building conditions and their adverse health issues. The State's unreasonable failure to exercise the options available to it under the lease lengthened the plaintiffs' exposure to the harmful environment present in the building. I find that the trial court's apportionment of 100% of fault to the State within an "acceptable range." Therefore, I would affirm the trial court's allocation of fault.
BONIN, J., Concurs in Part and Dissents in Part with Written Reasons.
I concur in Sections I, II, III, IV, V, VI(b), and VI(c), but dissent from Sections VI(a) and VII.

Section VI(a):
Clearly BAHA as the property owner must bear part of the fault and assessment of damages.[1] However, I disagree with the majority's apportionment of fault. Although the State had ample and extensive opportunities in the context of its lease with the building owner, BAHA, to protect its employees, it failed to exercise its right to make repairs and deduct the expense of the repairs from the lease payments, or to vacate the premises and terminate the lease upon sixty days written notice to BAHA.[2] Instead of taking a course of action either to remediate the problems or to abandon the site, the State actually entered into additional leases at this property and exposed additional employees.
Given its opportunities to remove its employees from the harmful and toxic environment of the BAHA premises, or to make corrections to that environment and pass the cost on to the building owner, the State was comparatively more at fault than the building owners and thus should bear a larger percentage of the quantum. State employees worked at the Plaza Tower Office Building beginning in 1996[3] after the signing of the five-year lease. Complaints of deficiencies in the building began soon after the employees took occupancy and continued. The testimony of Kenneth Lanier, a State environmental health science manager, showed that he visited the office in November 1996 to meet with tenants complaining of the environment, suspecting asbestos or some other toxic element in the building's atmosphere; and in August and October of 2001 he visited the building, performed environmental tests, and issued reports on his inspections. At trial he admitted that the complaints made in 2001 were similar to those made to him in 1996-7. Only after the State employees filed their class action suit for damages due to mold exposure did the State take steps to remove its employees from the building.
Comparing the fault of the State and BAHA pursuant to the factors set forth in Watson v. State Farm Fire & Cas. Ins. *1165 Co., 469 So.2d 967, 974 (La.1985), which are (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) whether the capacities of the actors were superior or inferior; (5) whether any extenuating circumstances required to act or to proceed without proper thought; and (6) the relationship between the actor's conduct and the harm to the plaintiffs, I find that the State should bear a larger percentage of fault because of the longstanding and vociferous complaints of its employees working in the building, and of the availability of State employees who were trained or expert in environmental and scientific experience who could and should have done more, sooner. Moreover, the availability of repair personnel and materials would have allowed the State to exercise the repair option under its lease, forcing BAHA to ultimately pay for the repairs performed to the satisfaction of the State and its skilled employees to properly correct the environmental flaws (i.e., there would have been no economic incentive for applying "band-aid fixes"). Similarly, the State had legal staff to pursue reimbursement and protect all rights under the lease to make the State whole. Or, in the alternative, finding new office space in the city for relocation of the State agencies would have been a reasonable remedy under the lease.
According to the precepts of the Watson case, under these circumstances, I would assess sixty-five (65%) percent of the fault and liability against the State; and thirty-five (35%) percent of the fault and liability against BAHA.

Section VII:
The majority decision is correct that the State misperceives the October 13, 2004 judgment which did not provide for the payment of any court costs by the settling defendants to the plaintiffs. From the proceeds of the settlement payment to the plaintiffs, the October 13, 2004 judgment permitted the plaintiffs' attorneys to be reimbursed the costs which they had advanced. The transaction is only on the plaintiffs' side of the case and no party adverse to the plaintiffs has paid them court costs for which the State would be entitled to a credit.
However, there is no legal basis for the majority to substitute its appreciation of the court costs and reduce them, despite the trial court's action, on the basis that any one or more of the costs might also be recoverable at some later time in another one of the consolidated cases known as Johnson and Rhodes. Had the trial judge made such a reduction, I would have concluded that such was well within the proper exercise of her discretion. However, the trial judge was more familiar with the consolidated proceedings than we are. That a deposition may be usable in more than one case does not require or compel a reduction in this case. It may entitle the State in some subsequent case to a credit or it may preclude seeking payment in any other consolidated case. But if the deposition was used in this case and an expert witness testified in this case, then the full amounts are taxable as costs in this case. La. C.C.P. art.1920, La. R.S. 13:4533, and La. R.S. 13:3666.
In conclusion, I concur in those portions of the majority decision which affirm the trial court's judgment, I respectfully dissent from that portion of the decision which allocates the greater fault to the property owner and the lesser fault to the State, and I further respectfully dissent from the modification of the award of court costs by the trial court.
NOTES
[1] According to the State's brief, the Watters class consists of approximately four hundred members.
[2] After the leases were executed, the ownership of the building (and the rights under the State's leases at issue) was transferred from BAHA to another corporate entity. According to the petition, BAHA transferred ownership of the building to NOOB I GP, LLC and NOOB I, LP. For ease of discussion, we refer to the building owner as BAHA. The insurers for the building were also joined as defendants. The building owners and insurers settled their claims and are not parties to this appeal.
[3] Because the leases at issue were for more than 5,000 square feet of space, the Louisiana Procurement Code, La. R.S. 39:1551, et seq., applied and required the DOA's approval of each lease. La. R.S. 39:1643.
[4] An emergency procurement allows the agency to bypass the normal procurement requirements, but requires the agency show good cause and obtain the DOA's approval.
[5] Although the record does not contain many complaints for the year 2000, it does include documentation that the water intrusion problems with the building were continuous from the time the state moved the employees into the building until the time they moved them out of the building. Indeed, water intrusion during 2000 is documented.
[6] Illustrative of such assurances, on February 10, 1997, Mary Boudreaux, a RN who worked in the building, wrote a letter to then DHH Secretary, Bobby Jindal, listing problems with the Plaza Tower including overflowing toilets and air condition and heating problems. On February 20, 1997, Mr. Jindal wrote back to Ms. Boudreaux stating: "We are aware of the many problems associated with the recent relocation of several of our offices to the Plaza Tower building in New Orleans and have enlisted the assistance of executive staff in DHH along with the Division of Administration to resolve these problems."
[7] Ms. Watters testified that until the summer of 2001 the only thing she was aware of that was wrong with the building was that it had asbestos. She stated that they were told that the asbestos was not the cause of what was making them feel bad. She further stated that they were repeatedly told the building was safe and that the building management displayed signs in the lobby touting the great air quality in the building.
[8] On this occasion, Mr. Lanier was accompanied by a co-worker, Todd Page. Mr. Page also accompanied Mr. Lanier on his October 2001 visit. Although both Mr. Page and Mr. Lanier co-authored both the August 2001 and October 2001 reports that were issued following their investigation, we refer to Mr. Lanier as the author of both reports for ease of reference.
[9] Mr. Mayer testified that he and Ms. Briscoe shared supervision over the DSS staff attorneys. Although Mr. Mayer's office was located in Baton Rouge, he visited the building about once of month. He first became aware of a mold problem with the building in 2001 when the DSS staff attorneys brought the problem to his attention. In August 2001, he personally took two samples (a tape strip and a cutout piece of ceiling tile) and sent the samples to be tested.
[10] HVAC is the civil engineering abbreviation for heating, ventilating, and air condition. Encarata Dictionary.
[11] As discussed elsewhere, the State emphasizes that Mr. Lanier's recommendations did not include evacuating the building. Mr. Lanier, who was a registered sanitarian, was obligated under La. R.S. 40:4 to report any imminent health danger or any type of unhealthy situation. Mr. Lanier testified that the Plaza Tower did not present an imminent health threat.
[12] Ms. Watters also testified that in August 2001 her DSS legal department filed a grievance requesting that the building be tested. As noted above, during that same month, Mr. Mayer took two samples, which tested positive for Stachybotry. About a week later, the DSS moved its legal department from the seventeenth to the twenty-seventh floor of the building. In November 2001, Ms. Watters' legal department filed a second grievance seeking to be moved out of the building. Beginning in November 2001, the DSS allowed the staff attorneys in Ms. Watters' legal department to work out of satellite sites; however, the other DSS employees and the DSS case files remained in the building until they were moved out in 2002.
[13] The complex procedural history of this case is set forth in part in this court's previous opinion, Watters v. Department of Social Services, 05-0324 (La.App. 4 Cir. 4/19/06), 929 So.2d 267, writs denied, 06-1598, 06-1601 (La.9/29/06), 937 So.2d 870 (Watters I). Simply stated, the trial court granted motions to transfer and consolidate this suit, the Watters case, with two other suits arising out of alleged exposure to mold in the Plaza Towers: the Rhodes case and the Johnson case. Neither of those other cases is before us on this appeal. The trial court granted the motions to certify the class filed in both the Watters and the Johnson cases. No motion to certify was filed in the Rhodes case. In Watters I, we affirmed the trial court's certification of the class in both the Watters and Johnson cases, but remanded for clarification of the Watters class definition.
[14] The revised definition of the Watters class tracks the definition of the Johnson class, which we affirmed in Watters I. The definition of the Johnson class is "all present or past `contract foster-parents' of the DSS who were required by the terms of their contractual duties to occupy the Plaza Tower from 1995, to the date of their departure from the Plaza Tower, who were exposed to fungal substances such as mold and mold spores which were growing on building materials and the by-product of the mold and mold spores that were released into the air."
[15] Although the matter was initially set for a jury trial, the jury was struck based on the plaintiffs' stipulation that none of their claims exceeded the $50,000 jury threshold.
[16] The trial court refused to accept Dr. Rai as a "mold expert."
[17] Nine of the State's seventeen assignments of error pertain to causation; those assignments of error are as follows:

 Finding of a causal connection between mold in the Plaza Tower and plaintiffs' complaints of illness given the absence of testimony;
 Finding the Appellant's liable despite the lack of proof that the air inside the Plaza Tower contained more mold or mold spores than the air outside the Plaza Tower;
 The finding of causation given the plaintiffs' testimony that they suffered from similar medical problems both before and after they worked in the building;
 Basing a factual determination on Dr. Rai's testimony given the fact that she first saw the plaintiffs six years after they occupied the building;
 Disregarding Dr. Lopez and Dr. Rai's testimony that there was no basis to find causation between mold in the Plaza Tower and the plaintiffs' complaints;
 Applying the presumption that plaintiffs' claims were causally related in spite of the plaintiffs' testimony that they suffered from the same types of illnesses now as they did when the[y] worked in the Plaza Tower.
 Finding that plaintiffs' headaches were causally related without any supporting testimony;
 Finding that plaintiffs' skin discomfort claims were causally related without any supporting testimony: and
 Finding causation in favor of the remaining class members without any testimony.
[18] General causation refers to proving exposure in a dose sufficient to cause health effects  that exposure to mold can cause disease. See Zimko v. American Cyanamid, 03-0658, p. 28 (La.App. 4 Cir. 6/8/05), 905 So.2d 465, 485-86, writ denied, 05-2102 (La.3/17/06), 925 So.2d 538. Specific causation refers to proving a sufficient causative link between the alleged health problems and the specific type of mold. Id. Distinguishing these two causation problems, a commentator notes that "[o]ne is the problem of establishing that the chemical involved is capable of causing the type of harm from which the plaintiff suffers. ... The other problem relating to proof of causation is that of establishing, given that the toxic substance in question can cause harm of the type suffered by the plaintiff, that the plaintiff's harm did in fact result from such exposure." Daniel A. Farber, Toxic Causation, 71 Minn. L.Rev. 1219, 1227-28 (1987).
[19] As noted elsewhere, the widespread presence of mold in the Plaza Tower was noted by Mr. Lanier in both his August 2001 and October 2001 reports. Dr. David Straus, plaintiffs' expert in microbiology, testified that the building had an obvious mold problem. The results of the samples taken in August 2001 by Mr. Mayer, the DSS Office of General Counsel, established the presence of an abundance of Stachybotrys in the building.
[20] Insofar as health effects, Judge Doherty testified that during the time he worked in the building he was plagued with hay fever and often developed colds. In 1998, he developed pneumonia, which lasted for a long period. He stated that he did not connect his health concerns to anything in the building. He also stated that he could not say that his symptoms abated when he left the building.
[21] The comparative fault of the State and the building owner in relation to the mold is discussed elsewhere in this opinion.
[22] The cause-in-fact element requires the plaintiffs establish by a preponderance of the evidence that the defendant's alleged tortious conduct was a cause of their injuries. The principal test for doing so is referred to as the "but for" test: whether "but for" the defendant's alleged breach of duty the plaintiffs would have sustained injuries. Frank L. Maraist and Thomas C. Galligan, Louisiana Tort Law, § 4-2 (1996).
[23] The "Housley presumption," as set forth in Housley v. Cerise, 579 So.2d 973 (La. 1991), provides that a medical condition producing disability is presumed to have resulted from an accident, if, before the accident the injured person was in good health, but shortly after the accident, the disabling condition manifested itself. Recently, Justice Victory in a concurring opinion suggested that the Housley presumption should be applied solely in workers' compensation cases. Detraz v. Lee, 05-1263, p. 1 (La.1/17/07)(Victory, J., concurring), 950 So.2d 557, 567-68.
[24] Although, as Ms. Watters testified, the employees were supposed to make copies and get rid of the moldy one files when the moved, Ms. Wiltz testified that "[e]vidently the State did not do as they said they were going to do."
[25] Dr. Rai was not the treating physician of any of the Class Representatives. Only two of the Class Representatives received contemporaneous medical treatment during the time they were in the Plaza Tower: Ms. Wiltz and Ms. Lemieux. A December 14, 2001 letter from Ms. Wiltz's doctor, Dr. Swift, indicated that her workplace "may have aggravated underlying allergy symptoms and problems" and recommended she be moved to another workplace. A February 20, 2002 letter from Ms. Lemieux's doctor, Dr. Joseph Tanimie, stated that "[t]he extent to which this pre-existing respiratory condition [sarcoidosis (a systemic granulomatous disease of unknown orgin that most frequently impairs pulmonary function)] was aggravated or affected by an exposure at her work site is unclear. ... [T]here is no evidence to indicate she has had ongoing infection associated with exposure to mold." Although in 1987 Ms. Lemieux was diagnosed with sarcoidosis, the parties stipulated that nothing in the Plaza Tower exaggerated or aggravated Ms. Lemeiux's sarcoidosis. In 2005, Ms. Lemieux had a bilateral lung transplant.
[26] Dr. Rai opined that "[a]lthough Gina Recasner's health outcome during her employment at Plaza Tower[] is certainly not straightforward because of her predisposing symptoms [prior history of headaches and sinusitis], I believe it is more likely than not that she was adversely affected by mold exposure during this time period. The severity and frequency of her headaches and sinusitis increased, she experienced noticeably itchy skin for the first time, and she had symptoms of a runny, blocked, or stuffy nose."
[27] Dr. Rai stated that although Ms. Lemieux had a compromised pulmonary system before beginning work in the Plaza Tower, her symptoms of watery eyes, throat discomfort, weak voice, and swallowing problems have significantly subsided away from that environment.
[28] Dr. Rai testified that Ms. Wiltz's physical exam was abnormal in that she had elevated blood pressure and wheezing in her lungs. She characterized Ms. Wiltz as quite ill and noted that most of her symptoms that emerged while working in the Plaza Tower had not abated. Dr. Rai emphasized that she was not claiming that all of Ms. Wiltz symptoms were related; rather, she testified that she was limiting her opinion to those symptoms which are supported by Damp Indoor Spaces  respiratory symptoms of nasal irritation, watery eyes, throat discomfort, and coughing. Although Dr. Rai indicated in her report that Ms. Wiltz had no appreciable health concerns before 1997, Dr. Rai testified that Ms. Wiltz apparently did not relate a lot of her past medical history to her. Finally, Dr. Rai stated that "[i]n a larger sense, prior to her working at the Plaza Towers, Ms. Wiltz was not ill, she became ill while working there, and she remains ill." Dr. Lopez testified that Ms. Wiltz's allergy and respiratory systems increased after she stopped being exposed to mold in the work environment. When asked by the trial court judge what this meant, he responded that it meant "what happened was the opposite; she really had more symptoms after 2003."
[29] Ms. Wiltz was the only Class Representative who had a skin prick test; the test revealed that she was highly allergic to mites, but not allergic to any of the molds tested. Several of the Class Representatives, including Ms. Watters, had blood tests taken. Dr. Lopez noted that he reviewed Ms. Watters' blood test results, which indicated that she was not allergic to the three or four molds that were tested.
[30] As noted earlier, a registered sanitarian is obligated under La. R.S. 40:4 to report any imminent health danger or any type of unhealthy situation.
[31] La. C.C. art. 2322 provides:

The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice or defect in its original construction. However, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known of the vice or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.
[32] Because we find, as the Class Representatives contend, that the State's actions constituted a continuing tort we find it unnecessary to address the Class Representatives' alternative argument that the State's prescription plea was untimely.
[33] The State also argues that it, like the Class Representatives, was unaware of the mold problem until shortly before it moved the employees out of the building. This argument is belied by the State's superior position to have discovered the problem at an earlier date. Shortly after they were moved into the building the Class Representatives questioned whether their symptoms were related to asbestos exposure in the building. As noted elsewhere in this opinion, both the State and the building owner reassured the Class Representatives that the building was safe.
[34] La. R.S. 9:2798.1 provides:

B. Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policy making or discretionary acts when such acts within the course and scope of their lawful powers and duties.
C. The provisions of Subsection B of this Section are not applicable: (1) to acts or omissions which are not reasonably related to the legitimate governmental objective for which the policymaking or discretionary power exists; or (2) to acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct.
[35] The trial court's judgment awarding court costs, contrary to the Class Representatives' contention, is reviewable on appeal. Their contention that the award of court costs is not appealable because the State's order for appeal failed to expressly reference the trial court's post-trial judgment taxing costs is unpersuasive. The post-trial judgment taxing costs was part of the same post-trial judgment denying the parties cross-motion for new trial. That entire judgment was part of the appeal.
[36] The plaintiffs' attorneys by supplemental memorandum agreed to remove this category of costs.
[37] The trial court at the hearing on the motion to tax costs requested that plaintiffs' attorneys remove this category of costs.
[38] La. C.C.P. art. 595 provides that "[t]he court may allow the representative parties their reasonable expenses of litigation, including attorney's fees, when as a result of the class action a fund is made available, or a recovery or compromise is had which is beneficial, to the class." La. C.C.P. art. 595.
[1] BAHA leased only twenty percent of the building to the State. See Def. Exhibits 34, 35, 36, and 38.
[2] See Exhibit 2 of Rafizadeh deposition, Paragraphs 15, 16, and 22.
[3] After the initial lease, the State executed another five-year lease on April 5, 1998, for additional office space to place more DSS employees in the Plaza Tower.