TERRI F. LOVE, Judge.
11 This appeal arises from damage awards to eighteen plaintiffs for mold exposure and health problems suffered therefrom while working in the Plaque-mines Parish 911 center between 1998 and 2002. The building housing the 911 center was owned by the Plaquemines Parish Government. The Plaquemines Parish Government asserts that the trial court erred, alleging that the plaintiffs failed to prove a causal link between its alleged tortious conduct and the alleged subsequent injuries. The Plaquemines Parish Government contends that the lack of medical evidence at trial mandates a reversal. We find that the trial court did not err in awarding the eighteen plaintiffs damage awards after weighing their testimony and the scientific evidence presented at trial. Therefore, we affirm.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Brenda Reddoch and Lettie Marinovich (“Plaintiffs”) filed a Class Action Petition for Damages, seeking certification, as potential class representatives against Plaquemines Parish, Plaquemines Parish Council, and ABC Insurance Company. The Plaintiffs alleged that they suffered health problems as a result of working in a hazardous, mold-infested building (“Building”) owned by the Plaquemines Parish Government (“PPG”) from 1998-2002, which housed the 911 |acenter and jail. The trial court found that the Plaintiffs failed to establish commonality and denied the request for class certification. Supplemental and amended petitions for damages were then filed to include additional plaintiffs.
Prior to trial, a majority of the Plaintiffs and all of the defendants[1] were dismissed *685 except for PPG. Twenty-five Plaintiffs remained. At trial, eighteen Plaintiffs testified or were represented by testimony from their heirs, if the plaintiff was deceased at the time of trial. The trial court found that the eighteen Plaintiffs established that they were exposed to mold in PPG’s building. As a result, they suffered damages from health problems caused by the exposure to mold. The trial court awarded damages as follows:
June Isaacs $20,000
Lynn Sanger $25,000
Dorothy Barnie $25,000
Michael Hudson $15,000
Albert Perry $15,000
Melissa Buras $25,000
S.E. Roberts $15,000
Mary Ann Bell $ 5,000
Danyl Cosse $ 5,000
Aretha Etienne $25,000
Michael S. Etienne, Jr. $ 5,000 Marie Etienne $ 5,000
Michael Etienne, Sr. $15,000
Arthur Reddick $15,000
Sandra Ritchey $ 5,000
Morris Roberts $10,000
Thomas Reddoch $25,000
Jaunh Dorsey $25,000
PPG then filed a Motion for a New Trial, and the Plaintiffs’ opposition noted that the trial court’s judgment omitted two Plaintiffs. The trial court denied the Motion for New Trial and held that the Plaintiffs did not file a motion for new trial to 13address the two allegedly omitted Plaintiffs. PPG’s suspensive appeal followed.
PPG asserts that the trial court erred because no causal link between the alleged tortious conduct regarding the mold and the alleged subsequent injury was proven and that it is entitled to a judgment of reversal based upon La. G.C.P. art. 2164.

STANDARD OF REVIEW

The manifest error or clearly wrong standard of review is utilized when appellate courts review findings of fact. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). The Louisiana Supreme Court has established “a two-part test for the reversal of a factfinder’s determinations.” Stobart v. State through Dep’t of Transp. & Dev., 617 So.2d 880, 882 (La.1993). First, “[t]he appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court.” Id. Second, “the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).” Id.
“[WJhere there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.” Rosell, 549 So.2d at 844. “[T]he court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.” Id. If two reasonable views of the evidence exist, then the factfinder cannot be manifestly erroneous. Id. When findings of fact “are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings” because “only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and 14belief in what is said.” Id.
“However, if a legal error interdicts the fact finding process, the manifest error standard of review is no longer applicable, and, if the record is otherwise complete, the appellate court should make an independent de novo review of the record and determine which party should prevail.” *686 Chambers v. Vill. of Moreauville, 11-898, p. 4 (La.1/24/12), 85 So.3d 593, 597. Questions of law are also reviewed using the de novo standard of review. Thibodeaux v. Donnell, 08-2436, p. 3 (La.5/5/09), 9 So.3d 120, 122.

TRIAL TESTIMONY OF PLAINTIFFS June Isaac

June Isaac worked for the Plaquemine’s Parish Sheriffs Office (“Sheriffs Office”) as a 911 dispatcher from December 1999 until March 2002. Ms. Isaac viewed mold on the ceiling tiles and the vents and stated that “the smell was really bad.” Ms. Isaac began to suffer from headaches, congestion, breathing problems; and her asthma was exacerbated by the mold. While working in the Building, Ms. Isaac had to increase the frequency of her asthma inhaler refills and took Claritin every day. “The longer I [Ms. Isaac] worked in the building it [health problems] got progressively worse.” However, Ms. Isaac’s health improved when she was not at work and after the 911 center moved out of the Building. Ms. Isaac worked next to Ms. Reddoch.

Lynn Sanger

Lynn Sanger was also a 911 dispatcher from 1998 — 2002, while the Sheriffs Office housed the 911 center in the Building. Ms. Sanger saw mold on the ceiling tiles and the carpet and stated that “the equipment room flooded several times ... and you could smell like, it smelled musty when you went in there, it | Bnever smelled fresh.” Ms. Sanger and other dispatchers complained about the mold to PPG. Some of the ceiling tiles were replaced several times and other remediation attempts were made. However, Ms. Sanger suffered from an irritated throat and headaches and had to begin taking over the counter medications to try to alleviate her symptoms. When the 911 dispatchers were removed from the Building, Ms. Sanger’s symptoms improved.

Dorothy Barnie

Dorothy Barnie worked as a 911 dispatcher with the Sheriffs Office in the Building from 1998-2002. Ms. Barnie “started with all kind of allergies which is sneezing, coughing, runny nose, fever.” She did not suffer from these problems prior to working in the building and her symptoms worsened the longer she worked in the Building. Further, Ms. Barnie testified that Plaquemines Parish attempted remediation, but the attempts made her symptoms worse. When the 911 dispatchers moved out of the Building, Ms. Barnie’s symptoms improved.

Michael Hudson

Michael Hudson was incarcerated in the jail located in the Building from 1998-2001. Mr. Hudson experienced a “sore throat and nose problems” that he did not have prior to his incarceration in the Building. Mr. Hudson stated that his health problems ceased after his release.

Albert Perry

Albert Perry, a smoker, was also incarcerated in the jail from 1998 — 2002. Mr. Perry cleaned the “911 room up from the top to the bottom” every day. Mr. Perry had to exit the Building and get fresh air because of breathing problems he developed. He did not previously have breathing problems. Mr. Perry knew he “was cleaning up, all I know it [sic] was some kind of mold.” Mr. Perry did not Rhave the breathing problems when he was not around the mold.

S.E. Roberts

S.E. Roberts, a past smoker, was employed as a “jailer” from 1998-2002. Mr. Roberts saw mold in the Building. Mr. Roberts testified that the ceiling was always black and that the upstairs carpet *687 was always wet. Mr. Roberts could smell the mold. The mold caused Mr. Roberts to experience “a little asthma” and “little allergies and everything.” However, after Mr. Roberts stopped working in the Building, his health problems ceased.

Mary Ann Bell

Mary Ann Bell’s husband[2] was a “jailer” in the Building and she visited him there daily. Mrs. Bell could smell mold, viewed wet carpets, and water coming inside the Building when it rained. Mrs. Bell’s eyes would burn and she would experience headaches and migraines. However, her symptoms disappeared when she was away from the mold. Mrs. Bell’s late husband’s health problems began with flu-like symptoms. Then he suffered from pulmonary problems, his ankles and feet would be swollen by the end of the day, and he would be short of breath. Mrs. Bell’s late husband smoked before they were married.

Darryl Cosse

Darryl Cosse was assigned to the Building for nine or ten months, between 1998-2002, as a “jailer” and then worked transporting prisoners. Mr. Cosse, a smoker, noticed a mildew smell. Mr. Cosse’s doctor told him that a past infection was probably caused by the mold. Mr. Cosse never experienced that same infection again, but the infection caused pain in his chest, headaches, and allergies that lasted “[a] couple days, three or four days.”

J¡¡Aretha Etienne

Aretha Etienne was employed at the 911 center from 1998-2002. She was in the 911 center every day and could see and smell the mold. While working in the Building, Mrs. Etienne suffered from “[cjoughing, headaches, nausea, [and a] scratchy throat.” Mrs. Etienne did not have those health problems prior to work-tag in the Building. After the 911 center moved out of the Building, Mrs. Etienne’s symptoms lessened. Mrs. Etienne’s two children stayed with her in the Building every day after school for a couple of hours. Her childrens’ health problems were similar to allergies, so Mrs. Etienne gave them over the counter medications to relieve their symptoms. Mrs. Etienne’s childrens’ health problems ceased after the 911 center relocated.

Michael Etienne, Jr.

Michael Etienne, Jr., Mrs. Etienne’s son, remained with his mother in the Building after school until her workday ended. Michael “would be congested like my nose would start running, I would have headaches.” Michael no longer experienced these health problems after the 911 center was relocated.

Maria Etienne

Maria Etienne, Mrs. Etienne’s daughter, also remained with her mother in the Building after school. Maria suffered from headaches, nausea, and a runny nose. Maria did not experience these health problems before her mother worked in the Building or after the 911 center was relocated.

Michael Etienne, Sr.

Michael Etienne, Sr., Mrs. Etienne’s husband, was at the jail every day from 1998-2002, and maintained all personnel files in the Building. He stated that the Building had a “stale smell.” Mr. Etienne suffered from headaches, sinus ^problems, and nausea. His symptoms improved after leaving the Building. Mr. Etienne reiterated that his two children were at the Building daily and that he witnessed the symptoms of both his children and his wife.

*688
Arthur Reddoch

Arthur Reddoch worked as a “jailer” in the Building from 1998-2002, and also went into the 911 center. Arthur saw mold and noticed a smell in the Building. Arthur suffered from a runny nose that ceased when he stopped going to the Building.

Sandra Ritchey

Sandra Ritchey’s husband was a “jailer” in the Building for an unspecified period of time between 1998-2002. Ms. Ritchey visited the 911 center almost every day that her husband worked. She brought her husband lunch and visited with him. She also visited with the 911 center dispatchers. Ms. Ritchey noticed moldy smells and saw black mold. She experienced “[ajllergies, [a] burning nose, [and a] throat, itchy.” Ms. Ritchey did not have these health issues “much” prior to working in the Building and her symptoms ceased after leaving the Building.

Morris Roberts

Morris Roberts, a road deputy for the Sheriffs Office and a smoker, went to the 911 center on a daily basis for work. Mr. Roberts also visited the 911 center on some of his days off from work. Mr. Roberts noticed the mold and testified that the mold smell was very strong in the 911 dispatchers’ office. Mr. Roberts’ health problems included “sneezing, runny nose, burning eyes, [and] coughing real bad.” Mr. Roberts did not experience these health problems prior to working in the Building, and his symptoms “ceased somewhat” after he stopped working in the Building.

J¿Thomas Reddoch

Thomas Reddoch, the husband of deceased plaintiff Mrs. Reddoch,[3] testified that his wife worked with the 911 center from 1998-2002. Mr. Reddoch’s wife was “very sick a lot of the time.” Mrs. Red-doch suffered from headaches, runny nose irritation, eye irritation, coughing, and congestion. Mrs. Reddoch did not have those health problems prior to 1998. Lastly, Mr. Reddoch could smell the mold on Mrs. Reddoch and in her hair when she came home from working in the Building.

Jaunh Dorsey

Jaunh Dorsey was employed as a 911 dispatcher from 1998 to May 2000. Ms. Dorsey saw and smelled the mold in the Building. She suffered from headaches and “more allergy and the sinus definitely.” Ms. Dorsey did not suffer from these health problems before working in the Building, and her health problems improved after leaving the Building. However, Ms. Dorsey’s symptoms “still act up sometimes.” PPG’s attempt at remediat-ing the mold “kind of made it worse, the smell and with the bleach and all that, it did, it kind of made the situation worse.” Ms. Dorsey testified that the attempted remediation did not alleviate the problems in the Building.

Melissa Buras

Melissa Buras worked in the criminal records room and the 911 center as a dispatcher from 1998-2002. Ms. Buras witnessed the mold “dripping from the ceiling, the carpet” was “always wet dew,” and could always smell mold. She suffered from “[h]eadaches, sore throat,” and nausea. She did not suffer with these health problems prior to working in the Building, and her health problems 1 ^diminished once the offices moved out of the Building. Ms. Buras no longer has any nose related health problems.

THE SCOTT REPORT

All of the parties stipulated to and entered into evidence a “Report of Fungal *689 Sampling and Analysis Services” (“Scott Report”) regarding the Building, as prepared by the W.D. Scott Group, Inc. for the Plaquemines Parish Health Department. The Scott Report took two “tape lift samples” from the 911 center in the Building. The Scott Report identified seven fungal organisms present in the Building from the two samples. Those fungal organisms were alternaría spp., aspergil-lus spp., chaetomium spp., curvularia spp., drechslera/helminthosporium spp., pencillium spp., and stachybotrys spp. The Scott Report concluded that “[f]rom the data obtained in this study, it is clear that fungal activity is present.”
Following the identification of the fungal activity present, the Scott Report contained these conclusions:
1. There is considerable evidence of elevated fungal activity in the ceiling area of the 911 Room. Stachybotrys spp. is present in this sample.
2. The carpet on the floor of the 911 Room shows relatively low levels of fungal activity.
3. The examined portion of the structure requires remediation to arrest further infestation, eliminate the fungal growth already present, and to prevent future, favorable conditions for fungal growth.
The Scott Report also made recommendations based on the information that six of the fungal organisms present “are known and documented aeroallergens” and that “[a]t least” one of the fungal organisms is “classified as toxigenic.” According to the Scott Report, PPG should “[e]liminate the current source of condensation in the above-ceiling area of the structure,” “[r]e-move and dispose of building materials l^that show substantial and visible fungal growth,” “[c]onduct the removal of building materials that show visible fungal growth under containment conditions, with the use of negative or positive pressure ventilation, as applicable,” “HEPA vacuum all surfaces of the structure, to the extent possible, to capture fungal spores that have been spread by renovation and other activities,” “[d]evelop a specification for the remedial work,” and “[rjetain the services of a qualified remediation contractor, with appropriately trained and equipped personnel to carry out the above outlined actions.”

CAUSAL LINK

PPG contends that the trial court erred because the Plaintiffs failed to establish a causal link between their mold exposure and their alleged resulting symptoms. PPG states that the Plaintiffs did not introduce any medical evidence, “[n]ot a medical report, not a medical bill, not a prescription receipt, not so much as a drug store receipt for a package of cough drops.”
PPG contends that the Plaintiffs failed to prove general and specific causation between their alleged health symptoms and the mold present in the Building due to a lack of specific medical testimony.
In Watters, this Court explained that:
[plaintiffs in a mold personal injury case must establish causation on five different levels: (i) the presence of mold, (ii) the cause of the mold and the relationship of that cause to a specific defendant, (iii) actual exposure to the mold, (iv) the exposure was a dose sufficient to cause health effects (general causation), and (v) a sufficient causative link between the alleged health problems and the specific type of mold found (specific causation).
Watters v. Dep’t of Soc. Servs., 08-0977, pp. 16-17 (La.App. 4 Cir. 6/17/09), 15 So.3d 1128, 1142-43. Additionally,- in Housley, the Louisiana Supreme Court held that:
*690 |12[a] claimant’s disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition.
Housley v. Cerise, 579 So.2d 973, 980 (La.1991), quoting Lucas v. Ins. Co. of N. Am., 342 So.2d 591, 596 (La.1977). This Court expounded upon Housley, which required proof of a “causal connection between” the alleged tortious conduct and the resulting injury, by stating that Housley represented “an extension of this presumption into the realm of general delictual actions.” Juneau v. Straumyer, 94-0903, p. 5 (La.App. 4 Cir. 12/15/94), 647 So.2d 1294, 1298. This Court further held that the causal connection must be demonstrated “through evidence — medical, circumstantial, or common knowledge” and provide “a reasonable possibility of causation between the accident and the claimed injury.” Id., 94-0903, p. 6, 647 So.2d at 1299.
“A trial court’s finding of causation is a factual finding that should not be disturbed unless the record does not furnish a basis for that finding, and it is clearly wrong or manifestly erroneous.” Watters, 08-0977, p. 32, 15 So.3d at 1152. “While expert medical evidence is sometimes essential, it is self-evident that, as a general rule, whether the defendant’s fault, was a cause in fact of a plaintiffs personal injury or damage may, be proved by other direct or circumstantial evidence.” Lasha v. Olin Corp., 625 So.2d 1002, 1005 (La.1993).
Eighteen plaintiffs testified during the trial about the mold in the Building, its smell, and the health problems they suffered as a result of exposure to the mold. The presence of mold in the Building was undisputed. In further support, the Scott Report confirmed the presence of seven kinds of fungal organisms in the Building. | joThe Scott Report also described the symptoms the seven types of fungal organisms can cause, most notably “allergic disease” and “allergic reaction.”[4] Based on the record, we do not find that the trial court committed manifest error in finding causation. The Plaintiffs’ testimony coupled with the Scott Report are sufficient sources of direct and circumstantial evidence that the mold caused the Plaintiffs’ symptoms. Accordingly, we affirm.

LA. C.C.P. ART. 2164

PPG next asserts that this Court should review the record de novo based upon La. C.C.P. art. 2164, which provides that:
[t]he appellate court shall render any judgment which is just, legal, and proper upon the record on appeal. The court may award damages, including at-tomey fees, for frivolous appeal or application for writs, and may tax the costs of the lower or appellate court, or any part thereof, against any party to the suit, as in its judgment may be considered equitable.
PPG also avers that the trial court committed legal error by applying incorrect principles of law. However, this Court, as discussed above, found that the trial court was not manifestly erroneous in its find *691 ings. Therefore, PPG’s argument is without merit.

DECREE

For the above-mentioned reasons, we find that the trial court did not commit manifest error in awarding damages to the eighteen plaintiffs based on the evidence presented at trial and affirm.
AFFIRMED.

. Additional defendants were added following the filing of the original Class Action Petition *685 for Damages. However, only the documents filed with the trial court after the denial of the class certification were compiled into the record on appeal.

. Ms. Bell's deceased husband was also a plaintiff.

. Mrs. Reddoch was a smoker and passed away from lung cancer.

. The descriptions in the Scott Report also state that "hypersensitive individuals” and those who are "immune-compromised” are more likely to notice the adverse health effects.